**WELLS FARGO ASIA LIMITED, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 84 Civ. 996 (WK).**

United States District Court, S.D. New York.

May 28, 1987.

Edwin E. McAmis, Skadden, Arps, Slate, Meagher & Flom, New York City (Mitchell C. Sockett, of counsel), and Darryl Snider, Brobeck, Phleger & Harrison, San Francisco, Cal. (Duncan E. Haynes, Jessica M. Hoover and Susan E. Samuels, of counsel), for plaintiff.

John E. Hoffman, Jr., Shearman & Sterling, New York City (Henry Weisburg, Jen-

nifer Freeman, Robert S. Fischler and Melissa Samet, of counsel), for defendant.

Joyce E. Motylewski, Federal Reserve Bank of New York, Office of General Counsel, and New York Clearinghouse Ass'n, Sullivan & Cromwell, New York City (John L. Warden, H. Rodgin Cohen and Michael Straus, of counsel), for amici curiae.

## MEMORANDUM & ORDER

### WHITMAN KNAPP, District Judge.

By this action, Wells Fargo Asia Limited ("Wells Fargo") seeks to recover from Citibank, N.A. ("Citibank") the balance concededly due on two one-million dollar time deposits (the "Deposits") with Citibank's Manila branch maturing respectively on December 9 and 10, 1983. Citibank declined payment on the maturity dates because of the existence of a Philippine governmental decree ("MAAB 47" or "the Decree") which forbade the repayment of the principal of certain foreign currency obligations without prior approval of the Central Bank of the Philippines ("Central Bank"). Citibank subsequently obtained approval for partial repayment and remitted to Wells Fargo the sum of $934,000. Citibank has declined any further payment, contending that it is excused by the Decree.

In July 1985 we denied Wells Fargo's motion for summary judgment. *Wells Fargo Asia Limited v. Citibank, N.A.* (S.D.N.Y.1985) 612 F.Supp. 351. The relevant facts are fully stated in that opinion, familiarity with which is assumed. Citibank resisted the motion for summary judgment by asserting that Philippine law governed the Deposits and that the Decree prohibited them from honoring plaintiff's demand without the permission of the Central Bank, which permission had been impossible to obtain. We concluded that the terms of the parties' agreement were far from clear and that an issue of fact had been presented by Citibank as to whether it could establish—by the proof of custom and usage—an agreed upon though unstated condition making the Deposits subject to Philippine sovereign risk, *i.e.*, the risk that

the Philippine government would take action preventing repayment. We decided no legal question.

The case was tried before us without a jury in December 1986. Citibank presented evidence aimed at establishing that Wells Fargo had accepted Philippine sovereign risk and that the Deposits therefore are payable only in Manila and are governed by Philippine law. Citibank again asserted that the Decree excused repayment. Wells Fargo—without abandoning its original contention that Citibank had accepted the risk that it would be liable elsewhere for obligations incurred by its Manila branch—took the position that we need not decide who bears Philippine sovereign risk because the actions of the Philippine government do not excuse honoring the Deposits. In other words, Wells Fargo now contends that it must prevail even if we assume that the Deposits are payable only in Manila and are governed by Philippine law. There being substantial authority for the proposition that the situs of a bank deposit is the branch where the deposit is made and that the depositor's rights are governed by the law of that locality, *cf., e.g., Dunn v. Bank of Nova Scotia* (5th Cir.1967) 374 F.2d 876, we accept plaintiff's invitation to assume that Philippine law governs this action. We shall further assume that plaintiff can recover only if—and to the extent which—it would have recovered had it instituted this action in an appropriate Philippine tribunal.

Before we delve into Philippine law, a brief digression into banking terminology is necessary. Citibank's receipt of a Eurodollar deposit creates a liability of the bank, since it is equivalent to borrowing. The asset thereby obtained is either loaned out, deposited with another bank or otherwise invested. Although Citibank is an international corporation with worldwide assets and liabilities, it—like most other banks—maintains separate books for each of its branches. In the case of assets carried on the books of its Manila branch, those assets which are invested with entities situated in the Philippines are considered Philippine (or local) assets, while

948

those deposited in banks located outside the Philippines or invested in non-Philippine enterprises are called non-Philippine assets. It is not disputed that the Decree currently prevents Citibank's Manila branch from using its Philippine assets toward repayment of the Deposits. It is further undisputed that Citibank was able to obtain Central Bank permission for its Manila branch to repay foreign depositors to the extent of the non-Philippine assets carried on the books of that branch, which resulted in the partial repayment of $934,000.

■ The dispute focuses on a third category of assets: assets booked at Citibank's offices outside the Philippines. Citibank concedes that a customer placing a deposit at a foreign branch would be entitled to call upon the bank's worldwide assets should the branch be unable to pay due to illiquidity, theft, fire, or a similar occurrence. It contends, however, that where the law of the country where the branch is located prevents repayment with assets booked at that branch, the depositor may not look elsewhere. As will be developed below, we conclude that Philippine law does not support Citibank's position.

With respect to Philippine law, we are presented with two conflicting affidavits by recognized Philippine authorities: Antonio V. Agcaoili on behalf of the defendant, and Gregorio R. Castillo on behalf of the plaintiff. We find Mr. Castillo's presentation to be far more persuasive and accept his conclusions.

Defendant's expert, Mr. Agcaoili, in an affidavit dated November 28, 1986, states that the Deposits are covered by the Decree, and concludes that the Decree creates a legal impossibility which prohibits Citibank from repaying them without prior Central Bank approval, thus excusing Citibank's performance until the requisite approval is granted (Par. 13). He does not explain how he arrives at these conclusions. He also observes that the Central Bank has not issued any forms or information regarding procedures to be followed in making a request for approval under MAAB 47, and that the lack of such procedures indicates the Central Bank's intention to discourage requests for repayment and not to grant such requests if made (Par. 9).

On the other hand, Mr. Castillo, in his affidavit executed on December 12, 1986, asserts that under Philippine law Citibank is obligated to repay deposits made in its Manila branch with its assets wherever located throughout the world (Par. 4–6), and categorically concludes that the Decree in no way inhibits repayment (in Manila or anywhere else) of the Deposits as long as Citibank uses assets that are carried on the books of its non-Philippine offices. (Conclusion, Par. 17). The reasoning behind these conclusions is spelled out in Paragraphs 2–6:

2. In the case of a deposit booked at the Manila office of a non-Philippine bank such as Citibank, MAAB 47 does not apply to repayment of the deposit with non-Philippine assets. "Non-Philippine assets" are assets that are carried on the books of the bank's non-Philippine offices.

3. Accordingly, under Philippine law, Citibank may repay the Deposits at issue in this case without prior Central Bank approval, as long as it uses non-Philippine assets for that purpose. (Such repayment may be made through Citibank's branch in Manila or anywhere else in the world).

4. Under Philippine law, branches of banks are not separate legal entities apart from the bank as an institution. As stated by the Philippine Supreme Court in *National City Bank of New York v. Posadas*, 60 Phil 630 (1934), (affirmed by the United States Supreme Court in *Posadas v. National City Bank of New York* (1936) 296 U.S. 497 [56 S.Ct. 349, 80 L.Ed. 351]):

"The local branches of the National City Bank of New York have no separate corporate franchise, no separate capital stock, and are controlled directly through officers and managers appointed by the National City Bank of New York ...

A branch is simply an extension of a national bank to foreign countries, [and] the branch of the National City

Bank of New York in Manila is the National City Bank of New York doing business in Manila."

Accordingly, under Philippine law, obligations incurred at a branch are obligations of the bank as a whole. Citibank, the institution, is the legal entity that entered into the Deposit contracts at issue in this case, not its Manila branch.

5. Under ... the Civil Code of the Philippines, the obligation of a bank under a deposit contract is not to return the very same funds deposited, but rather to repay funds of the same kind and amount. The funds to repay a deposit need not be funds booked at the same branch that booked the deposit. Rather, under Philippine law a depositor may look to any of the bank's assets, wherever located for repayment of a deposit.

6. In short, under Philippine law, Citibank's obligation to repay the Deposits is not limited to the assets booked at its Manila branch ("local assets").

Mr. Agcaoili's affidavit, which was dated some two weeks prior to Mr. Castillo's, could not, of course, address itself to these specific observations. We find it significant, however, that Citibank apparently thought it inadvisable to attempt a reply affidavit.

We would not, of course, accept Mr. Castillo's conclusions simply because of Citibank's failure effectively to contest them unless we were satisfied that they are correct. *See,* Fed.R.Civ.P. 44.1. We are so satisfied. Mr. Castillo's first conclusion— that under Philippine law, an obligation incurred by a branch is an obligation of the bank as a whole—is supported by the Philippine authority cited. We know of no Philippine authority to the contrary. The cases from other jurisdictions upon which Citibank relies are inapposite, as they all involve expropriation by a foreign government of a branch's assets, which, under the law of each respective locality, prevented repayment at the situs where the deposit was made. *E.g., Perez v. Chase Manhattan Bank* (1984) 61 N.Y.2d 460, 474 N.Y. S.2d 689, 463 N.E.2d 5, *cert. denied* (1984) 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302;

*Tillman v. National City Bank* (2d Cir.) 118 F.2d 631, *cert. denied* (1941) 314 U.S. 650, 62 S.Ct. 96, 86 L.Ed. 521; *Dunn v. Bank of Nova Scotia* (5th Cir.1967) 374 F.2d 876 (limited expropriation by taxation). While these cases could support the proposition that Philippine law controls this action, they shed no light on the question of what the applicable Philippine law may be.

Mr. Castillo's second conclusion—that repayment with Citibank's worldwide assets would not violate the Decree—is sustained by the evidence. The Philippine Central Bank has already specifically allowed Citibank's Manila branch to use its non-local assets in partial discharge of plaintiff's claim (as well as the claims of other foreign depositors). As cogently explained by Rafael Buenaventura, Citibank's Country Corporate Officer in the Philippines during the relevant time period, the essential purpose of the Decree was to prevent the outflow of foreign exchange from the Philippines. The Decree was enacted in response to a severe loss of foreign exchange which threatened the Philippines' ability to import fuel, food, medicines and raw materials, and other items for which foreign exchange is necessary. However, as both Dr. Ian Giddy (Citibank's expert witness as to banking practices) and Mr. Buenaventura testified, the Philippine government's concerns are not implicated by repayment with funds held by banks not domiciled in the Philippines (or, presumably, by calling in loans made to non-Philippine entities). Since these assets are already located outside the Philippines, and therefore are not part of the country's foreign exchange reserves, there is no outflow of foreign currency. Tr. 911–13, 920–921, 1018–19.

Furthermore, plaintiff has presented us with a communication from Philippine authorities specifically disavowing any objection to discharging the remainder of the obligation using funds from Citibank's non-Philippine offices. Pl.Ex. 59. That telex, dated December 14, 1984, states:

If there is a judgment by a court or an extrajudicial settlement to the effect that a foreign curency [sic] deposit placed

with a foreign currency deposit unit ('FCDU') of the Philippine branch of a foreign bank is recoverable from a non Philippine office of such foreign bank and if such liability is satisfied from assets held outside the Philippines and does not result, directly or indirectly, in a net outflow of foreign currency from the Philippines the Central Bank of the Philippines is of the view that the satisfaction of payment of such deposit liability on these terms would not be inconsistent with [the Decree].

The Central Bank's reasoning is obvious: assets carried on the books of Citibank's non-Philippine offices have no connection to the Philippines and are beyond the control of the Philippine government. Mr. Castillo's conclusion that the Decree was not intended to require Central Bank permission for the use of such funds to discharge plaintiff's claim therefore seems wholly reasonable.

In summary, we conclude that under Philippine law Citibank's worldwide assets are available for satisfaction of plaintiff's claim, and that the Decree does not prevent transfer of such assets from outside the Philippines to Manila in order to repay the Deposits. The foregoing conclusion renders irrelevant most of the questions the parties have disputed before us. However, we shall briefly comment on some of them.

Since each party to some extent tried to establish the existence of a custom or practice in international banking which might modify the meaning of their deposit agreement, we shall simply observe that no relevant custom or practice was established by either party.

As indicated in footnote number 2 of our summary judgment opinion, there was dispute between the parties as to whether or not Citibank's Eurodollar deposits earned the same interest if made in secure localities such as London or in presumably riskier places such as Manila. For reasons stated at oral argument, we resolve that issue in plaintiff's favor and find Citibank's

Eurodollar interest rate to be identical in all localities.

There was much dispute as to the meaning and impact of Federal Reserve Regulation D, which exempts from reserve requirements a deposit payable only at a foreign branch of a U.S. bank.[1] Foreign branch deposits which are guaranteed by a promise of payment in the United States are subject to federal reserve requirements. Since Regulation D is generally interpreted to exempt Eurodollar deposits from federal reserve requirements, Citibank argued that the regulation demonstrates an understanding in the banking community that such deposits are payable only at the branch where made, and subject to the law of the host country. As we have accepted—for the purposes of this lawsuit—the proposition that the deposits were payable only in Manila and subject to Philippine law, this argument has become moot.

There was also much discussion of the Act of State doctrine. The doctrine applies when judicial consideration of a foreign government's act is likely to have a negative impact upon the executive branch's conduct of international affairs. If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act. *Allied Bank International v. Banco Credito Agricola de Cartago* (2d Cir.) 757 F.2d 516, 520–21, *cert. dismissed* (1985) —— U.S. ——, 106 S.Ct. 30, 87 L.Ed.2d 706. In view of our conclusion that neither Philippine law nor policy are in any way offended by the requirement that Citibank repay these Deposits, the Doctrine is in no way implicated.

In relation to Citibank's defense of impossibility of performance, we made a finding at the close of the trial that Citibank had satisfied its good faith obligations to procure the government's consent to the repayment of these deposits. In the light of our interpretation of the Decree, that finding becomes irrelevant. However, if

---

**1.** Federal law provides that depository institutions, such as Wells Fargo and Citibank, are required to set aside reserves equal to a specified portion of the deposits they receive. 12 C.F.R. § 204.1 *et seq.* (1986).

the Decree should be interpreted (as Citibank urges) to require Central Bank permission in order to make payment at the Manila branch with Citibank assets transferred to Manila for that purpose, we would be required to modify our finding. There is nothing in the record to suggest that Citibank made the slightest effort to obtain such consent. On the contrary, everything suggests that approval would have been readily granted if requested. Thus, the impossibility defense would fail even if the Decree were interpreted to require such consent.

In view of the testimony by Citibank's expert witness, Dr. Ian Giddy, to the effect that any decision in this case might give rise to concern in the banking community if it were misconstrued (Tr. 1034–1035) we wish to emphasize the limits of our holding. We deal only with two specific deposits payable in Manila on December 9 and 10, 1983 and governed by the particular Decree we have discussed. We have not considered the law of any other jurisdiction, or what would have happened in Manila had the Philippine government, through taxation or the exercise of any other sovereign power, sought to expropriate any part or all of these Deposits, or if it had sought to confiscate the assets of any depositor or class of depositors, or had in any way impeded or sought to impede the payment of the Deposits with non-Philippine assets to any depositor or class of depositors. Neither have we evaluated the new confirmation slips which we are told Citibank has begun using since the events here in issue, and we do not speculate as to what effect, if any, they may have on future transactions in the Eurodollar market.

Let the plaintiff submit an appropriate judgment on 10 days notice.

SO ORDERED.