**WELLS FARGO ASIA LIMITED, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 84 Civ. 996 (WK).**

United States District Court, S.D. New York.

April 22, 1988.

Edwin E. McAmis, Skadden, Arps, Slate, Meagher & Flom, New York City (Mitchell C. Sockett, of counsel), Darryl Snider, Brobeck, Phleger & Harrison, San Francisco, Cal. (Duncan E. Haynes, Jessica M. Hoover, Susan E. Samuels, of counsel), for plaintiff.

John E. Hoffman, Jr., Shearman & Sterling, New York City (Henry Weisburg, Jennifer Freeman, Robert S. Fischler, Melissa Samet, of counsel), for defendant.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

On March 25, 1988 the Court of Appeals 847 F.2d 837 (2nd Cir.1988) (hereinafter "The Court") remanded this action, finding it unclear whether our opinion disposing of this case had found that the parties had agreed that the deposits were collectible only at Citibank's Manila branch or whether we had held that Philippine law gov-

erned this action. In point of fact, we made no decision on either of these questions although they had been extensively argued. Before attempting to answer them, we shall—by way of background—briefly explain our earlier decision to avoid such determinations.

Ever since this lawsuit began, the parties have vigorously contested the issues underlying both these questions. On plaintiff's motion for summary judgment, it contended that the contract made the deposits payable in New York, and that MAAB 47 did not purport to prohibit repayment of the deposits in New York with Citibank's general assets. Citibank, on the other hand, contended that discovery would reveal an understanding in the banking community that foreign branch deposits are payable only in the country where the branch is located, and subject to the host country's laws. Throughout the trial, Wells Fargo maintained the position that New York law applied, and Citibank continued to insist that the case was governed by the law of the Philippines, including MAAB 47, which was claimed to have excused repayment of plaintiff's deposits.

After the trial had been completed, it turned out—as noted in Citibank's brief to the Court (at 15–16)—that the complete extent of the evidence concerning Philippine law consisted of "two affidavits by Philippine lawyers" totalling "less than fourteen pages."[1] Upon that state of the record, Wells Fargo, while reiterating its earlier positions, also submitted that it would prevail even if we were to assume that Philippine law governed. We accepted this invitation to decide the case under Philippine law, on the further assumption (which seemed to us reasonable) that Citibank had put its best foot forward in presenting its views as to that law.

It turned out, however, that Citibank was by no means so satisfied, and presented the Court with a wealth of material on Philippine law which it had never brought to our attention. Had Citibank made a motion before us to reconsider our decision on the basis of this additional authority, we certainly would have granted such a motion and would then have proceeded to decide all the issues of fact and questions of law which had been presented to us,[2] declining what would then have appeared to be an ill-considered invitation by Wells Fargo. It is on that basis that we shall now answer the specific questions posed by the Court.

(a) *Whether the parties agreed as to where the debt could be repaid, including whether they agreed that the deposits were collectible only in Manila.*

At the outset, it appears to us that repayment and collection describe two distinct concepts. Repayment refers to the location where the wire transfers effectuating repayment at maturity were to occur. Collection refers to the place or places where plaintiff was entitled to look for satisfaction of its deposits in the event that Citibank should fail to make the required wire transfers at the place of repayment.

Of course, the contract itself is the first place we must look to determine the parties' agreement.

Neither party disputes the formation of a binding deposit contract, nor is it disputed that the placements were initially arranged over the telephone by the parties' traders with the assistance of an Asian money-broker, Astley & Pearce. No evidence was introduced as to what the traders said, or even whether they spoke to each other directly or conducted their negotiations entirely through the broker. The only clue we have on this subject is the report prepared by the broker for the par-

---

1. In its brief to the Court (at 16) Citibank observes that "Judge Knapp did not request any further submission or testimony regarding Philippine law." We gather from this statement that Citibank thinks we should have treated it as some sort of *pro se* litigant and taken responsibility for assuring that it had adequately researched the law it had for over two years been urging us to apply.

2. Citibank, in its brief to the Court (at 18) and again in its reply brief (at 1–2), states that we had "decided" that Philippine law determines the deposit obligations in this case. As our opinion was intended to make clear, we expressly refrained from making any such decision, but acted on the *assumption* that Philippine law was controlling.

ties. The document sent by Astley & Pearce, states (Pl.Ex. 10):[3]

> Borrower: Citibank, N.A. Manila
>
> Lender: Wells Fargo Asia Ltd., Singapore
>
> We hereby confirm having negotiated the following deposit/placement on your behalf:
>
> Amount: US$1,000,000.00
>
> Rate: 10%
>
> Term: 178 das.
>
> From: 14–06–83 To: 09–12–83
>
>     *    *    *    *    *    *
>
> Pay: Citibank, N.A. New York Account Manila
>
> Repay: Wells Fargo International, New York
>
> Account: Wells Fargo Asia Ltd., Singapore
>
> Account # 003–023645.

A telex sent by Astley & Pearce to Wells Fargo (Pl.Ex. 12) similarly states:

> We confirm having arranged the following for your account and risk—
>
> Principal: US 1,000,000
>
> Rate: 10
>
> From: 14/06/83   To: 9/12/83
>      14/06/83        12/12/83
>
> Instructions:
>     Settlement—Citibank NA NYC Ac Manila
>     Repayment—Wells Fargo Bk Intl NYC
>     Ac Wells Fargo Asia Ltd Sgp No 003–023645

Subsequently, Wells Fargo and Citibank exchanged written confirmations (Pl.Ex. 4–9). Wells Fargo's confirmation slips state (Pl.Ex. 8, 9):

> We shall instruct Wells Fargo Bk Int'l New York our correspondent please pay to our a/c with Wells Fargo Bk Int'l New York to pay to Citibank NA customer's correspondent USD 1,000,000.

The telexes from Citibank's Manila office to Wells Fargo in Singapore state (Pl.Ex. 4–7):

> Please remit US Dlr 1,000,000 to our account with Citibank New York. At maturity we remit US Dlr 1,049,444.44 to your account with Wells Fargo Bank Intl Corp NY through Citibank New York.

These various confirmations reflect that the interbank placements were accomplished through a series of wire transfers by the parties' correspondent banks in New York, and that, at maturity, the deposits were to be repaid by Citibank, N.A. (Citibank's New York correspondent bank) to Wells Fargo Bank International (Wells Fargo's New York correspondent bank) for the account of Wells Fargo's Singapore office. Thus, the confirmations establish an agreement that repayment was to occur in New York.

As to the second component of the Court's question, whether the parties agreed that the deposits were collectible only in Manila, the confirmation slips are silent. At trial, both sides offered evidence aimed at establishing that an agreement concerning the place of collection could be implied from custom and usage in the international banking field. This evidence consisted of testimony from various bankers about their interbank placement practices and their understanding of sovereign risk. In addition, each party's expert testified on these topics. In particular, each expert analyzed the relevant interest rates which were claimed to support his own opinion or defeat the view of the opposing party's expert. Citibank, for example, sought to demonstrate an understanding that the depositor could collect only in the country where the deposit was placed, i.e., the Philippines, on the theory that "sovereign risk" accounted for the fact that interest rates in Manila were higher than those in New York. Wells Fargo, on the other hand, introduced evidence aimed at showing an understanding within the Eurodollar market that the depositor could look to the head office for repayment. Wells Fargo's witnesses stressed the identity of the interest rates in Manila and in concededly less risky locations such as London.[4] In our

---

**3.** Pl.Ex. 11, reflecting the second deposit, is identical in all respects except that the term is 181 days, and the maturity date is accordingly 12–12–83.

**4.** There was dispute between the parties as to whether or not Eurodollar deposits earned the same interest if made in secure localities such as London or presumably riskier places such as Manila. We previously found that Citibank's

prior opinion (J.A. 596; 660 F.Supp. 946, at 950) we observed that neither party succeeded in establishing any universal understanding amounting to custom or practice within the banking community which would imply a collection term into the contract. We believe that observation to have been correct, and now so find.

In summary, since the deposit contracts do not reflect any agreement on the issue of where the deposits could be collected, and since no term can be implied based on custom or usage in the Eurodollar market, we find that the parties failed to come to an agreement on this question.

(b) *If there was an agreement, what were its essential terms?*

The only agreement relating to collection or repayment was that repayment would occur in New York.

(c) *Whether Philippine law (other than MAAB 47) precludes or negates an agreement between the parties to have the deposits collectible outside Manila?*

We know of no such provision of Philippine law.

(d) *If there is no controlling Philippine law referred to in (c) above, what law does control?*

Much of the confusion which has transformed this case from a simple breach of contract action into one which—it is claimed—threatens the foundations of the international monetary system stems, in our view, from the fact that the parties have never been able to agree as to exactly what they are fighting about. In Citibank's view, the real dispute in this case is whether MAAB 47 provided a legally valid reason for Citibank to avoid payment of plaintiff's deposits, which are conceded to be due. Citibank argued as follows: the deposits are payable only in Manila subject to Philippine law; MAAB 47 prevents repayment in Manila; therefore, Citibank has a legally recognized reason to avoid payment. Wells Fargo, however, never seriously contested the proposition that MAAB 47 prevented Citibank from using the assets booked at its Manila branch toward repayment of plaintiff's deposits.[5] Rather, the portion of Citibank's syllogism that Wells Fargo challenges is the contention that Citibank's obligation to satisfy the deposits is limited to the assets booked at Citibank's Manila branch. Wells Fargo contends that under New York law, which it claims governs this action, it is entitled to look to all of Citibank's assets for repayment, even if MAAB 47 disabled the Manila branch from using its own assets to meet the deposit obligations. Hence, the dispute in this case—to which most of the trial was devoted in the guise of discussing "sovereign risk"—boils down to one question: is Citibank obligated to use its worldwide assets to satisfy plaintiff's deposits? In other words, the dispute is not so much about where repayment physically was to be made or where the deposits were collectible,[6] but rather which assets Citibank is required to use in order to satisfy its obligation to plaintiff. As we have previously found that the contract was silent on this issue, we interpret query (d) as imposing upon us the task (which so far we have been able to avoid) of deciding whether New York or Philippine law controls the answer to that question.

■ The legal principles governing our determination are straightforward. Juris-

---

Eurodollar interest rate was identical in all localities (J.A. 597; 660 F.Supp. at 950).

**5.** In our previous order, we found that MAAB 47 prevented the use of assets booked at Citibank's Manila branch (both Philippine and non-Philippine assets), but that it did not prohibit use of assets carried on the books of any other Citibank branch (J.A. 590–591; 660 F.Supp. at 948).

**6.** Unlike many of the cases cited to us by Citibank, *e.g. Perez v. Chase Manhattan Bank, N.A.* (1984) 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5; *Braka v. Bancomer* (2d Cir.1985) 762 F.2d 222; *Garcia v. Chase Manhattan Bank, N.A.*

(2d Cir.1984) 735 F.2d 645; *Vishipco Line v. Chase Manhattan Bank, N.A.* (2d Cir.1981) 660 F.2d 854; *Callejo v. Bancomer* (5th Cir.1985) 764 F.2d 1101; this case does not involve certificates of deposit or similar tangible documents that must be presented at a particular branch in order to secure repayment. On the contrary, Citibank's obligation to remit the funds to Wells Fargo was triggered by the passage of time, and Wells Fargo was not required to make a "demand" or take any other action in Manila or anywhere else.

diction in this action is asserted both on the basis of diversity and federal question involving 12 U.S.C. § 632. In diversity cases, of course, we must apply the conflict of law doctrine of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.* (1941) 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. In federal question cases, we are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.* (2d Cir.1980) 629 F.2d 786, 794–95, *cert. denied* (1981) 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804. The rule in New York is that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.* (1969) 24 N.Y.2d 372, 382, 300 N.Y.S. 2d 817, 825, 248 N.E.2d 576, 582. Federal law invokes similar considerations, *see, Corporacion Venezolana,* 629 F.2d at 795, and the place of performance is considered an important factor. *Citibank, N.A. v. Benkoczy* (S.D.Fla.1983) 561 F.Supp. 184, 186 and cases cited therein.

Regardless of whether the New York or federal test is used, application of these standards leads us to the conclusion that New York law should be used to evaluate Wells Fargo's contention that Citibank's worldwide assets are available for repayment of the deposits. As the New York Court of Appeals has recognized, "New York ... is a financial capital of the world, serving as an international clearing house and market place for a plethora of international transactions ... In order to maintain its preeminent financial position, it is important that the justified expectations of the parties to the contract be protected." *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.* (1975) 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 172. In our view, these expectations will be best promoted by applying a uniform rule of New York law where, as here, the transactions were denominated in United States dollars and settled through the parties'

New York correspondent banks, and where the defendant is a United States bank with headquarters in New York. Since Eurodollar transactions denominated in U.S. dollars customarily are cleared in New York (Howard Tr. 450), the rationale for application of New York law becomes even stronger. If the goal is to promote certainty in international financial markets, it makes sense to apply New York law uniformly, rather than conditioning the deposit obligations on the vagaries of local law, and requiring each player in the Eurodollar market to investigate the law of numerous foreign countries in order to ascertain which would limit repayment of deposits to the foreign branch's own assets.

■ As to what New York's law is on this question, the answer is not entirely clear. In at least one older case, the Second Circuit, interpreting New York law, concluded that there was no obligation due at the main branch to a depositor in another branch. *United States v. First National City Bank* (2d Cir.1963) 321 F.2d 14, *aff'd on rehearing en banc* (2d Cir.1964) 325 F.2d 1020, *rev'd on other grounds* (1965) 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365. However, the most recent pronouncement on this subject by New York's highest court, which we believe binds us, holds that the parent bank is ultimately liable for the obligations of the foreign branch. *Perez v. Chase Manhattan National Bank, N.A.* (1984) 61 N.Y.2d 460, 468, 474 N.Y.S.2d 689, 691, 463 N.E.2d 5, 7, *citing, Sokoloff v. National City Bank of N.Y.* (Sup.Ct.N.Y.Cty.1927) 130 Misc. 66, 73, 224 N.Y.S. 102, 114, *aff'd* (1928) 223 App.Div. 754, 227 N.Y.S. 907, *aff'd* (1928) 250 N.Y. 69, 164 N.E. 745. *Accord, Vishipco Line v. Chase Manhattan Bank, N.A.* (2d Cir.1981) 660 F.2d 854, 863.

Notwithstanding this general rule, there are circumstances in which we believe a New York court would defer to local law. For example, if the Philippines had confiscated plaintiff's deposits, New York courts would interpret the expropriation as a compulsory assignment of the depositor's rights, so that payment to the Philippine

assignee would discharge the debt. A New York court would further recognize such compulsory assignment as an act of a foreign sovereign unreviewable under the Act of State doctrine. *Perez, supra,* 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5. We believe New York would take a similar approach in the situation where a foreign government had effected a partial confiscation in the form of a tax on a deposit made at a foreign branch. *See, Dunn v. Bank of Nova Scotia* (5th Cir.1967) 374 F.2d 876. However, we are aware of no persuasive authority to tell us to what extent, if any, a New York court would defer to local law in the situation here presented, where the foreign sovereign did not extinguish the branch's debt either in whole or in part but merely conditioned repayment on the obtaining of approval from a government agency. Fortunately, we need not resolve that troublesome question. It is not presented by the record before us.

Citibank's answer in this action attempts to raise a circumstance requiring deference to local law by asserting, as an affirmative defense, that "MAAB No. 47 excuses Citibank's performance of the deposit arrangements." (Answer ¶ 25). Throughout this litigation, we and the parties have treated this allegation as raising an impossibility defense. Of course, the Decree itself must provide the parameters for evaluating such a defense. MAAB 47 provides, in pertinent part:

> Any remittance of foreign exchange for repayment of principal on all foreign obligations due to foreign banks and/or financial institutions, irrespective of maturity, shall be submitted to the Central Bank thru [sic] the Management of External Debt and Investment Accounts Department (MEDIAD) *for prior approval.*
>
> Accordingly, total obligations to foreign banks/financial institutions as of the end of business hours in New York City on October 14, 1983, shall not be reduced *without prior Central Bank approval.* (Emphasis supplied)

Thus, the Decree specifically contemplates that obligations to foreign banks may be repaid as long as prior Central Bank approval is obtained.

With respect to Citibank's efforts to comply with the Decree, we refer back to the three types of assets which we discussed in our prior opinion. In the case of assets carried on the books of Citibank's Manila branch, those which are invested with entities situated in the Philippines are considered Philippine (or local) assets, while those deposited in banks located outside the Philippines or invested in non-Philippine enterprises are called non-Philippine assets. It is not disputed that Citibank sought but did not obtain approval for its Manila branch to use its Philippine (or local) assets toward repayment of the Deposits. It is further undisputed that Citibank applied for and did receive Central Bank permission for its Manila branch to repay foreign depositors to the extent of the non-Philippine assets carried on the books of that branch. This approval resulted in the partial repayment of $934,000. However, no permission was ever sought to use the third category of assets here at issue, namely, assets booked at Citibank's offices outside the Philippines. Hence, assuming without deciding that MAAB 47 required Citibank to secure permission in order to use its worldwide assets, we have no way of knowing whether or not approval would have been granted. We can, however, say with certainty that, having failed to request approval, Citibank's impossibility defense must fail. When the "government or other restraint does not render performance absolutely impossible, it is the duty of the promisor to make a bona fide effort to dissolve and be relieved of the restraint which operates to prevent his performance." *Brown v. J.P. Morgan* (Sup.Ct.N.Y.Cty.1941) 177 Misc. 626, 31 N.Y.S.2d 323, 334, *rev'd on other grounds* (1st Dep't 1943) 265 App.Div. 631, 40 N.Y.S.2d 229, *aff'd* (1946) 295 N.Y. 867, 67 N.E.2d 263. In our earlier order, we made a finding that Citibank had not satisfied its good faith obligation to seek the government's consent to use the assets booked at Citibank's non-Philippine offices (J.A. 598, 660 F.Supp. at 950–951), and we hereby reaffirm that finding.

In summary, we conclude that under New York law, which governs this question, Citibank is liable for the debt of its Manila branch and plaintiff is entitled to look to Citibank's worldwide assets for satisfaction of its deposits. We do not express any view as to what the New York courts would have done in the event that Citibank had requested authorization to use such assets, and approval had been denied. That situation is not presented on this record.

We therefore conclude that no amended judgment is appropriate and reaffirm the one previously entered.

The foregoing shall constitute our supplemental findings of fact and conclusions of law. The Clerk is directed forthwith to certify this Memorandum and Order to the Court of Appeals.

SO ORDERED.