**WELLS FARGO ASIA LIMITED,**
Plaintiff–Appellee,

v.

**CITIBANK, N.A., Defendant–Appellant.**

No. 652, Docket 87–7685.

United States Court of Appeals,
Second Circuit.

Final Submissions After Remand
from Supreme Court Feb. 19, 1991.

Decided June 26, 1991.

Darryl Snider, Los Angeles, Cal. (George A. Cumming, Jr., Duncan E. Haynes, Jessica M. Hoover, Brobeck, Phleger & Harrison, San Francisco, Cal., of counsel), for plaintiff-appellee.

Robert H. Bork, Washington, D.C. (Michael S. Helfer, David Westin, Scott Hoing, Yoon–Young Lee, Wilmer, Cutler & Pickering, and Kenneth S. Geller, Mark I. Levy, Stuart E. Abrams, Mayer, Brown & Platt, of counsel), for defendant-appellant.

John L. Warden, New York City (Michael M. Wiseman, Sandra M. Malinowski, Sullivan & Cromwell, Norman R. Nelson, Lawrence R. Uhlick, of counsel), for The New York Clearing House Ass'n and the Institute of Intern. Bankers as Amici Curiae in support of reversal.

Kenneth W. Starr, Sol. Gen. of the U.S., Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Jeffrey P. Minear, Asst. to the Sol. Gen., Anthony J. Steinmeyer, John P. Schnitker, Attys., Dept. of Justice, Michael J. Matheson, Principal Deputy Legal Adviser, Dept. of State, Jeanne S. Archibald, Acting Gen. Counsel, Dept. of the Treasury, J. Virgil Mattingly, Gen. Counsel, Bd. of Governors of the Federal Reserve System, Alfred J.T. Byrne, Gen. Counsel, F.D.I.C., Robert B. Serino, Deputy Chief Counsel, Office of the Comptroller of the Currency, of counsel), for the U.S. as Amicus Curiae in support of reversal.

Kenneth V. Handal, New York City (Dennis G. Lyons, Robert H. Winter, Deborah S. Prutzman, David F. Freeman, Jr., Arnold & Porter, Christine E. Beatty, of counsel), for Bank of Montreal, Credit Du Nord, Maryland Nat. Bank, and the Toronto–Dominion Bank as Amici Curiae urging affirmance.

Before TIMBERS, KEARSE and MAHONEY, Circuit Judges.

KEARSE, Circuit Judge:

This action, brought by plaintiff Wells Fargo Asia Limited ("WFAL") to recover funds deposited with the Philippine branch of defendant Citibank, N.A. ("Citibank"), returns to us on remand from the United States Supreme Court, see Citibank, N.A. v. Wells Fargo Asia Limited, —— U.S. ——, 110 S.Ct. 2034, 109 L.Ed.2d 677 (1990), vacating and remanding 852 F.2d 657 (2d Cir.1988), aff'g 660 F.Supp. 946 (S.D.N.Y.1987) (Knapp, J.), for a determination of what law applies to the present controversy and the content of that law, and for resolution of the controversy in light of those determinations. For the reasons below, we affirm the district court's ruling that the law of New York is applicable and its award of judgment in favor of WFAL.

## I.  BACKGROUND

The background of this action has been recounted in several opinions, including Citibank, N.A. v. Wells Fargo Asia Limited, — U.S. ——, 110 S.Ct. 2034, 109 L.Ed.2d 677 ("WFAL IV"); Wells Fargo Asia Limited v. Citibank, N.A., 852 F.2d 657 (2d Cir.1988) ("WFAL III"), Wells Fargo Asia Limited v. Citibank, N.A., 695 F.Supp. 1450 (S.D.N.Y.1988) ("WFAL II"), and Wells Fargo Asia Limited v. Citibank, N.A., 660 F.Supp. 946 (S.D.N.Y.1987) ("WFAL I"), familiarity with which is assumed. Briefly, in 1983, WFAL, a Singapore-chartered bank wholly owned by the United States-chartered Wells Fargo Bank, N.A., placed two six-month nonnegotiable U.S. $1,000,000 deposits with Citibank for its branch in Manila, Philippines ("Citibank/Manila"). The deposit agreement called for WFAL to pay this amount to Citibank in New York for deposit at Citibank/Manila; it called for Citibank to repay Wells Fargo International's New York account for WFAL.

The deposits were to mature in December 1983. In October 1983, however, the Philippine government issued a Memorandum to Authorized Agent Banks ("MAAB 47"). As described in our earlier opinion, MAAB 47 provided, in pertinent part, as follows:

> Any remittance of foreign exchange for repayment of principal on all foreign obligations due to foreign banks

and/or financial institutions, irrespective of maturity, shall be submitted to the Central Bank [of the Philippines] thru the Management of External Debt and Investment Accounts Department (MEDIAD) for prior approval.

As interpreted by the Central Bank of the Philippines, this decree prevented Citibank/Manila, an "authorized agent bank" under Philippine law, from repaying the WFAL deposits with its Philippine assets, *i.e.*, those assets not either deposited in banks elsewhere or invested in non-Philippine enterprises. Citibank/Manila did not repay WFAL's deposits upon maturity.

*WFAL III*, 852 F.2d at 659. After WFAL commenced the present suit for repayment of the deposited amounts, Citibank/Manila sought and received permission from the Central Bank of the Philippines to repay its foreign depositors to the extent it could do so with non-Philippine assets. Citibank/Manila thereafter repaid WFAL $934,000, leaving $1,066,000 in dispute.

The district court, Honorable Whitman Knapp, *Judge*, entered judgment in favor of WFAL, rejecting Citibank's contention that MAAB 47 made it impossible to repay the WFAL deposits. Noting that MAAB 47 allows obligations to foreign banks to be repaid if the consent of the Central Bank is obtained, and further noting that Citibank had not satisfied its good faith obligation to seek that consent, the court concluded that Citibank's impossibility defense must fail. Though originally making this ruling on the hypothesis that the law of the Philippines applied, *see WFAL I*, 660 F.Supp. at 947, the district court concluded, upon request from this Court for clarification, that New York law, rather than Philippine law, governed the dispute, *WFAL II*, 695 F.Supp. at 1454. It ruled that under New York law, Citibank's worldwide assets were available for satisfaction of WFAL's claim. *Id.*

We affirmed. Though the district court had concluded (a) that repayment and collection are independent concepts, and (b) that the parties had not reached an agreement as to the situs of collection, and we

did not disturb those rulings, we concluded that the

authorities suggest that a debt may be collected wherever it is repayable, *unless* the parties have agreed otherwise. Since the court found here that there was no separate agreement restricting where the deposits could be collected, and we are aware of nothing in the record that contradicts that finding, we conclude that WFAL was entitled to collect the deposits out of Citibank assets in New York.

*WFAL III*, 852 F.2d at 661 (emphasis added).

The Supreme Court vacated our decision, stating that we appeared to have treated the concepts of repayment and collection as interchangeable rather than independent and to have "rel[ied] upon the existence of an agreement between Citibank and WFAL to permit collection in New York." *WFAL IV*, 110 S.Ct. at 2040. The Supreme Court concluded that the district court's finding that there was no agreement as to the situs of collection was not clearly erroneous; it also endorsed "the District Court's conclusion that the parties, in this particular case, failed to establish a relevant custom or practice in the international banking community from which it could be inferred that the parties had a tacit understanding on the point." *Id.* at 2041. Concluding that our decision could not be upheld on the theory that there was an agreement as to the place of collection, the Supreme Court remanded for a determination of whether WFAL's claim is governed by New York law, Philippine law, or federal common law, and what the content of the governing law is, and directed us to decide the appeal in light of those determinations:

Given the finding of the District Court that there was no agreement between the parties respecting collection from Citibank's general assets in New York, the question becomes whether collection is permitted nonetheless by rights and duties implied by law. As is its right, ... WFAL seeks to defend the judgment below on the ground that, under principles of either New York or Philippine law, Citibank was obligated to make its

general assets available for collection of WFAL's deposits.... It is unclear from the opinion of the Court of Appeals which law it found to be controlling; and we decide to remand the case for the Court of Appeals to determine which law applies, and the content of that law.

*Id.* at 2042.

Accordingly, we proceed to those questions.

## II. DISCUSSION

In response to this Court's earlier inquiry, the district court discussed the choice-of-law question as follows:

The legal principles governing our determination are straightforward. Jurisdiction in this action is asserted both on the basis of diversity and federal question involving 12 U.S.C. § 632. In diversity cases, of course, we must apply the conflict of law doctrine of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.* (1941) 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. In federal question cases, we are directed to apply a federal common law choice of law rule to determine which jurisdiction's substantive law should apply. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.* (2d Cir.1980) 629 F.2d 786, 794–95, *cert. denied* (1981) 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804. The rule in New York is that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Intercontinental Planning, Ltd. v. Daystrom, Inc.* (1969) 24 N.Y.2d 372, 382, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582. Federal law invokes similar considerations, *see, Corporacion Venezolana*, 629 F.2d at 795, and the place of performance is considered an important factor. *Citibank, N.A. v. Benkoczy* (S.D.Fla.1983) 561 F.Supp. 184, 186 and cases cited therein.

Regardless of whether the New York or federal test is used, application of these standards leads us to the conclusion that New York law should be used to evaluate Wells Fargo's contention that Citibank's worldwide assets are available for repayment of the deposits. As the New York Court of Appeals has recognized, "New York ... is a financial capital of the world, serving as an international clearing house and market place for a plethora of international transactions ... [.] In order to maintain its preeminent financial position, it is important that the justified expectations of the parties to the contract be protected." *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.* (1975) 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, 172. In our view, these expectations will be best promoted by applying a uniform rule of New York law where, as here, the transactions were denominated in United States dollars and settled through the parties' New York correspondent banks, and where the defendant is a United States bank with headquarters in New York. Since Eurodollar transactions denominated in U.S. dollars customarily are cleared in New York ..., the rationale for application of New York law becomes even stronger. If the goal is to promote certainty in international financial markets, it makes sense to apply New York law uniformly, rather than conditioning the deposit obligations on the vagaries of local law, and requiring each player in the Eurodollar market to investigate the law of numerous foreign countries in order to ascertain which would limit repayment of deposits to the foreign branch's own assets.

*WFAL II*, 695 F.Supp. at 1453–54.

As to the content of New York law on the matter, the district court noted that the most recent pronouncement of the New York Court of Appeals, *see Perez v. Chase Manhattan National Bank, N.A.,* 61 N.Y.2d 460, 468, 474 N.Y.S.2d 689, 691, 463 N.E.2d 5, 7, *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984), indicated that the parent bank is ultimately liable for the obligations of the foreign branch. Though the district court reasoned that an actual expropriation by the foreign govern-

ment would be treated differently, it concluded that in the present case, there having been no expropriation and no limitation of the depositor's rights but only action affecting the assets of the branch, New York law would allow collection of the debt in New York:

> [I]f the Philippines had confiscated plaintiff's deposits, New York courts would interpret the expropriation as a compulsory assignment of the depositor's rights, so that payment to the Philippine assignee would discharge the debt. A New York court would further recognize such compulsory assignment as an act of a foreign sovereign unreviewable under the Act of State doctrine. *Perez, supra,* 61 N.Y.2d 460, 474 N.Y.S.2d 689, 463 N.E.2d 5. We believe New York would take a similar approach in the situation where a foreign government had effected a partial confiscation in the form of a tax on a deposit made at a foreign branch. *See, Dunn v. Bank of Nova Scotia* (5th Cir.1967) 374 F.2d 876. However, we are aware of no persuasive authority to tell us to what extent, if any, a New York court would defer to local law in the situation here presented, where the foreign sovereign did not extinguish the branch's debt either in whole or in part but merely conditioned repayment on the obtaining of approval from a government agency. Fortunately, we need not resolve that troublesome question.

*WFAL II,* 695 F.Supp. at 1454–55. The court found it unnecessary to determine whether New York law would hold that a foreign government's refusal to give the prerequisite consent constitutes an excuse for refusal to make repayment, in light of its earlier finding that Citibank "had not satisfied its good faith obligation to seek the [Philippine] government's consent to use the assets booked at Citibank's non-Philippine offices." *Id.* at 1455. The court reaffirmed that finding.

█ We agree with the district court's analysis, and we conclude, substantially for the reasons that court stated, that New York law governs the present claim and that under New York law, Citibank was not excused from making repayment. In urging that we reach the contrary conclusion, Citibank argues that there is a clear federal policy placing the risk of foreign-law impediments to repayment on the depositor. In so arguing, it relies on federal banking rules such as 12 U.S.C. § 461(b)(6) (1988), which provides that banking reserve requirements "shall not apply to deposits payable only outside the States of the United States and the District of Columbia," and 12 C.F.R. § 204.128(c) (1990) (issued at 52 Fed.Reg. 47696, Dec. 16, 1987), which provides that "[a] customer who makes a deposit that is payable solely at a foreign branch of the depository institution assumes whatever risk may exist that the foreign country in which a branch is located might impose restrictions on withdrawals." Citibank's reliance on these provisions is misplaced. Federal law defines a deposit that is "payable only at an office outside the United States" as "a deposit . . . as to which the depositor is entitled, *under the agreement with the institution,* to demand payment *only* outside the United States." *Id.* § 204.2(t) (emphasis added). The provisions relied on thus do not reveal a policy allocating the risk to depositors as a matter of law where there is no such agreement. So long as state law does not restrict a bank's freedom to enter into an agreement that allocates the risk of foreign sovereign restrictions, state law does not conflict with the federal policy reflected in current statutes or regulations. We see no such restriction in the law of New York, and hence there is no " 'significant conflict'," *Miree v. DeKalb County, Georgia,* 433 U.S. 25, 31, 97 S.Ct. 2490, 2494–95, 53 L.Ed.2d 557 (1977) (quoting *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)), between New York law and federal law such as would be necessary to justify the creation of a federal common law.

█ We conclude that under New York law, unless the parties agree to the contrary, a creditor may collect a debt at a place where the parties have agreed that it is repayable. In applying this principle to

the circumstances of the present case to affirm the judgment in favor of WFAL, we do not assume the existence of an agreement between Citibank/Manila and WFAL to permit collection in New York; rather, in light of the express finding of the district court that the parties had no agreement as to permissible situses of collection, we rely on the absence of any agreement forbidding the collection in New York.

Finally, we note that on the present remand, WFAL urged us to affirm on the basis of recently submitted evidence that in fact Citibank, while refusing to use non-Manila assets to pay Citibank/Manila's debts, has received profits of at least $25 million from Citibank/Manila during the period 1984–1989. WFAL contends that it is entitled to have its deposits repaid out of these profits. Citibank does not dispute that it received these profits (see Citibank reply brief on remand at 20, n. 18, stating that these transfers "represent a small yield on capital investment that the Central Bank permits Citibank/Manila to remit to its home office") but takes the position that it is not required to use these profits to pay persons whose deposits in Citibank/Manila remain unpaid. We need not resolve this question. Suffice it to say that Citibank's acknowledged ability to obtain Philippine Central Bank approval of transfers to it of moneys as profits appears to support the district court's finding, if further support were needed, that Citibank in fact did not satisfy its good faith obligation to seek that government's approval of repayment of WFAL's deposits to WFAL.

## CONCLUSION

We have considered all of Citibank's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.