961 F.2d 341
 60 USLW 2654, 26 Collier Bankr.Cas.2d 1200,
Bankr. L. Rep. P 74,552, 17 UCC Rep.Serv.2d 1036
 In re: KOREAG, CONTROLE ET REVISION S.A., as Official
Liquidator of Mebco Bank, S.A. (In Liquidation)
pursuant to the Insolvency Laws of the
Federal Republic of Switzerland.
KOREAG, CONTROLE ET REVISION S.A., Petitioner-Appellee,
v.
REFCO F/X ASSOCIATES, INC., Respondent-Appellant.
 No. 651, Docket 91-5061.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 21, 1991.
Decided April 9, 1992.
 
 Jack Weinberg, New York City (Marianne Bretton-Granatoor, Therese M. Doherty, Graubard Mollen Horowitz Pomeranz & Shapiro, of counsel), for respondent-appellant.
 Celia Goldwag Barenholtz, New York City (Richard A. Edlin, Kronish, Lieb, Weiner & Hellman, of counsel), for petitioner-appellee.
 Before: PRATT, MAHONEY, and McLAUGHLIN, Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Respondent-appellant Refco F/X Associates, Inc. ("Refco") appeals from an order of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, entered September 16, 1991. That order affirmed an order of the United States Bankruptcy Court for the Southern District of New York, Cornelius Blackshear, Bankruptcy Judge, that granted summary judgment in favor of petitioner-appellee Koreag, Controle et Revision S.A. ("Koreag"), liquidator in a Swiss insolvency proceeding, on Koreag's petition pursuant to 11 U.S.C. § 304 (1988); ordered the turnover to Koreag of certain funds deposited in a New York bank account; and enjoined the continuation of a related lawsuit by Refco.
 
 
 2
 We vacate and remand, concluding that the district court and bankruptcy court should have made a threshold determination whether certain disputed funds in the bank account were "property of [the insolvent] estate" within the meaning of 11 U.S.C. § 304(b)(2) (1988).
 
 Background
 
 3
 This action arises from a series of currency exchange transactions that took place in April 1989. The issue on this appeal concerns the parties' respective interests in funds deposited in a New York bank account in connection with these exchanges.
 
 
 4
 A. The Transactions at Issue.
 
 
 5
 Much that follows has been stipulated by the parties. Refco is a corporation that engages in commodity and currency transactions around the world. It is organized under the laws of New York, and has its principal place of business in New York City. Mebco Bank, S.A. ("Mebco") is a Swiss bank currently in bankruptcy liquidation under the laws of Switzerland. Prior to liquidation, Mebco engaged in worldwide banking activities, including the trading of currencies.
 
 
 6
 Koreag is a Swiss corporation which has been appointed liquidator in charge of administering the distribution of Mebco's estate. Under Swiss law, Koreag is the sole entity authorized to act on behalf of Mebco. Swiss Bank Corporation is a Swiss bank whose New York branch office ("Swiss Bank-NY") is the locus of the bank account in which are deposited the funds at issue in this action.
 
 
 7
 Refco and Mebco first discussed doing business together at a meeting in Geneva, Switzerland in May 1986 between a Mebco representative and a representative of Refco's London office. Mebco subsequently provided its annual reports for 1986 and 1987 to Refco. On June 3, 1988, Refco granted Mebco a ten million dollar line of credit to be used for daily settlement of currency transactions.
 
 
 8
 Refco and Mebco engaged in extensive currency transactions beginning in June 1988. The trading of currencies was accomplished by direct communication between two dealers to determine the terms of the exchange: the currencies involved, the amounts, the exchange rate, and the banks to be used. The exchange was then consummated several days later by wire transfers of currencies in accordance with the prior agreement.
 
 
 9
 The currency exchanges conducted by Refco and Mebco were of two varieties, in both of which (according to the stipulation of the parties) "Refco and Mebco were each, at once, a purchaser and seller of currencies." The parties have also stipulated that "[t]he agreements between Refco and Mebco contemplated simultaneous exchanges of currencies."
 
 
 10
 One type of transaction involved Refco's selling foreign currency to Mebco in exchange for U.S. dollars. In that event, Refco would wire transfer the foreign currency into Mebco's account at a designated European bank. Mebco in turn would wire U.S. dollars into an account that Mebco maintained at Swiss Bank-NY (the "Account") with instructions to credit a Refco account at Citibank in New York. Alternatively, Refco purchased foreign currency from Mebco. In that case, the transaction would proceed in reverse, with Refco wiring U.S. dollars to the Account, and Mebco transferring foreign currency to a designated Refco bank account in Europe.
 
 
 11
 Refco and Mebco entered into several currency exchange contracts during the period April 20 to April 27, 1989. In partial settlement thereof, Refco wired $7,407,510 to the Account at 3:52 p.m. Eastern Standard Time[1] on April 28, 1989, in exchange for which Refco was to receive from Mebco foreign currencies of comparable value, to be delivered to Refco bank accounts abroad. Refco also delivered foreign currencies worth approximately 4.1 million dollars to Mebco European accounts from April 28 to May 2, 1989, and in exchange was to receive that amount in U.S. dollars from Mebco via the Account. In connection therewith, from April 20 to April 27, 1989, Mebco had transmitted orders to Swiss Bank-NY for payments from the Account to Refco's account at Citibank in the total amount of $8,789,800. Each of the individual trades was subject to approval by Refco's New York office, which sent confirmation slips for each transaction to Mebco in Switzerland.
 
 
 12
 At 10:15 a.m. on April 27, 1989, however, the Swiss Banking Commission of Switzerland placed Mebco into liquidation under Swiss law. Immediately thereafter, Koreag was appointed as liquidator. At approximately 2:00 p.m. that day, in accordance with instructions from its Geneva office, Swiss Bank-NY stopped all payments out of the Account, including the payments intended as performance for the Refco currency exchanges. Swiss Bank-NY received no instruction to stop receiving incoming transfers, on the other hand, and the Account remained open to receive deposits.
 
 
 13
 Refco was not informed by Debtor, Koreag, or Swiss Bank-NY that Debtor had been placed in liquidation, that the Account was closed to outgoing payments, or that Mebco would not perform its side of most of the pending currency exchanges.[2] The commencement of the liquidation proceedings was reported by the Dow Jones International News Service newswire, but Refco does not subscribe to that service, and claims that it never received notice that Mebco was in liquidation and its payment orders had been stopped.
 
 
 14
 Refco received a portion of the foreign currencies covered by its April 28 transfer to the Account of $7,407,510, but the remaining foreign currencies--corresponding to approximately 6.9 million of the U.S. dollars delivered to Mebco--were never delivered. Similarly, there has been no delivery to Refco of U.S. dollars in exchange for the foreign currencies worth approximately 4.1 million dollars that Refco delivered to Mebco European accounts from April 28 to May 2, 1989, although funds had been provided to the Account by Mebco for that purpose. The net result of these aborted currency exchanges is that Refco transferred approximately 6.9 million dollars into the Account, and approximately 4.1 million dollars worth of foreign currency to overseas Mebco accounts, for which Mebco failed to make reciprocating transfers.[3]
 
 
 15
 On May 3, 1989, Refco first learned of Mebco's financial situation in response to an inquiry into Mebco's failure to perform its side of the pending currency exchanges. During this conversation between Gary M. Weiss, senior vice president of Refco, and a Mr. Savio to whom Weiss was referred when he called Mebco in Geneva, Weiss orally demanded that Mebco return the U.S. dollars and foreign currencies that Refco had delivered to Mebco in connection with those exchanges. Thereafter, also on May 3, Citibank sent a telex message on behalf of Refco to Swiss Bank-NY requesting the return, inter alia, of the disputed 6.9 million dollars previously wired to the Account by Refco on April 28, 1989. Swiss Bank-NY responded by telex on May 4, 1989 that it would release the funds when authorized by Koreag to do so. Koreag never provided authorization, however, and the funds were never released.
 
 
 16
 Also on May 4, 1989, Weiss wrote a letter to Mebco, c/o Koreag, detailing "the amounts that are claimed from [Mebco] by [Refco] as of May 4, 1989." Further, see infra, a litigation affidavit by Weiss dated May 4, 1989 and served upon Mebco reiterated Refco's claim.
 
 
 17
 B. The Proceedings Below.
 
 
 18
 On May 5, 1989, Refco commenced an action against Mebco in the United States District Court for the Southern District of New York to recover the Disputed Funds. At the same time, Refco obtained an ex parte attachment of the Account. In support of the attachment, Refco served Koreag with papers that included an affidavit by Weiss dated May 4, 1989 which repeated Refco's claim and demand against Mebco, and attached as an exhibit Weiss' letter to Mebco, c/o Koreag, dated May 4, 1989. The attachment papers were delivered to an air courier for transmission to Mebco, and also mailed to Mebco, on May 5, 1989, and the courier completed its delivery to Mebco on May 8, 1989.
 
 
 19
 Refco moved the district court to confirm the attachment, and Koreag, intervening as Mebco's successor-in-interest, cross-moved to dismiss Refco's action. Koreag's position was that comity should be accorded to the Swiss insolvency proceeding, and that all the funds in the Account should accordingly be turned over for administration in Switzerland. The district court concluded that a proceeding pursuant to 11 U.S.C. § 304 (1988)[4] was the appropriate vehicle for determining whether to defer to the Swiss insolvency proceedings, and invited Koreag to initiate such a proceeding by application to the bankruptcy court.
 
 
 20
 Koreag promptly petitioned the bankruptcy court for relief ancillary to a foreign proceeding pursuant to § 304. The petition alleged that the "economical, expeditious and equitable administration of Mebco's liquidation governed by the insolvency laws of Switzerland" required that Mebco's assets in the United States be marshalled and turned over to Swiss insolvency authorities to "prevent the dismemberment of Mebco's estate, to avoid preferences, and to ensure the equitable administration of [the] estate[.]" The petition sought an injunction against further attempts by Refco to reach the funds in the Account, and an order turning over the Account to Koreag as liquidator pursuant to § 304(b)(2).
 
 
 21
 By decision entered August 26, 1991, the bankruptcy court granted summary judgment to Koreag. In re Koreag, Controle et Revision S.A., 130 B.R. 705 (Bankr.S.D.N.Y.1991). In reaching its decision, the court first rejected Refco's contention that the court lacked jurisdiction over the property sought by Koreag, i.e., the funds on deposit at the Account. Id. at 710-12.
 
 
 22
 Refco argued that before property could be turned over pursuant to § 304(b)(2), the court must determine that the property was part of the debtor's estate; in other words, the debtor's property. The bankruptcy court declined to make a threshold finding as to who owned the property, stating that Refco's argument "plac[ed] the proverbial 'cart before the horse.' " Id. at 711. The court initially stated that in order to establish jurisdiction to proceed pursuant to § 304, it need only be established that: "(1) a foreign proceeding was commenced against the debtor; (2) the petitioner is a foreign representative entitled to file the action under section 304; and (3) 'the debtor had certain assets within the judicial district where the petition was filed.' " Id. at 711 (quoting In re Trakman, 33 B.R. 780, 783 (Bankr.S.D.N.Y.1983)).
 
 
 23
 The court then declined to decide the need to satisfy the third (quoted) requirement, however, see 130 B.R. at 711 n. 3 (citing In re Metzeler (Metzeler v. Bouchard Transp. Co.), 78 B.R. 674 (Bankr.S.D.N.Y.1987)), because it deemed that requirement, in any event, fulfilled in this case. The court ruled that "when conducting a jurisdictional analysis, the laws in the foreign proceeding are determinative of whether the foreign bankrupt has assets located in the district in which the section 304 petition was filed," 130 B.R. at 711, and "[u]nder Swiss law, the funds in [the Account] are included in the property involved in Mebco's liquidation proceedings." 130 B.R. at 712. The court concluded: "The last jurisdictional requirement is satisfied since the funds are located in this district." Id.[5]
 
 
 24
 The bankruptcy court next evaluated the turnover request in light of the policy considerations set forth in § 304(c). The court stated that "[c]omity is inevitably the more significant factor since the other factors (except for the sixth element dealing with the fresh start theory) are inherently taken into account when considering comity." 130 B.R. at 712 (citing In re Culmer, 25 B.R. 621, 629 (Bankr.S.D.N.Y.1982)). Concluding that the laws of Switzerland were "not repugnant and violative of our fundamental notions of fairness," id. at 716, and that the "marshalling of Mebco's assets should be conducted in one forum with one set of laws so as to ensure equality among all of the creditors," id., the bankruptcy court granted summary judgment directing that the funds in the Account be turned over to Koreag. Id. Although the bankruptcy court's opinion stated that "the balance of [Koreag's] requests in its motion are denied in light of this Court's decision to turnover the funds," id., the order entered by the bankruptcy court permanently enjoined Refco from pursuing the action it had initiated against Mebco in the district court, in addition to directing turnover of the Account to Koreag.
 
 
 25
 The district court then entered an order on September 13, 1991, revised on September 16, 1991, that affirmed the bankruptcy court order "on Judge Blackshear's opinion below," but stayed enforcement of the order of the district court "until September 30, 1991 at 5:00 p.m. to permit [Refco] to apply to the Court of Appeals for a further stay." Refco thereupon appealed, and on October 1, 1991, this court granted a further stay directing "that the principal amount of $11,191,334.52 [see supra note 3], together with interest on that amount from May 5, 1989, ... be held by Swiss Bank pending final determination of Refco's appeal ..., and may not be transferred to Koreag," and expedited the appeal.
 
 Discussion
 
 26
 We begin by noting that we will review the decision of the bankruptcy court (and of the district court affirming on the opinion of the bankruptcy court) de novo because the questions presented are matters of statutory interpretation. See Truck Drivers Local 807 v. Carey Transp. Inc., 816 F.2d 82, 88 (2d Cir.1987).
 
 
 27
 Refco presents two arguments on appeal. First, Refco contends that because Refco had a superior property interest in the Disputed Funds, they were not "property of [Mebco's] estate" within the meaning of § 304(b)(2), and the bankruptcy and district courts accordingly erred in ordering their turnover to Koreag. Refco's alternative position is that even if the Disputed Funds were part of Mebco's estate, the bankruptcy and district courts incorrectly applied the factors set forth in § 304(c) in fashioning the turnover remedy.
 
 
 28
 We first turn to Refco's argument based upon § 304(b)(2). Responding to Refco's contentions, we initially consider whether, when an adverse claimant raises a plausible dispute concerning the ownership of property whose turnover is sought by a foreign liquidator pursuant to § 304(b)(2), a court should resolve that threshold issue before ordering turnover. Answering that question in the affirmative, we next consider what law governs the resolution of the ownership issue. Concluding that New York law provides the rule of decision in this case, we then address the § 304(b)(2) issue in terms of (1) the New York law of constructive trusts, and (2) the New York Uniform Commercial Code.
 
 
 29
 A. Threshold Determination of Ownership Issue.
 
 
 30
 Section 304(a) authorizes a "foreign representative" in a "foreign [bankruptcy] proceeding" to commence a "[c]ase ancillary to [that] proceeding" in a United States bankruptcy court to protect the administration of the foreign proceeding. The purpose of a § 304 petition is to prevent the piecemeal distribution of assets in the United States by means of legal proceedings initiated in domestic courts by local creditors. Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713-14 (2d Cir.1987); Cunard S.S. Co. v. Salen Reefer Servs. AB, 773 F.2d 452, 454-55 (2d Cir.1985). A bankruptcy court is given broad latitude in fashioning an appropriate remedy in a § 304 proceeding. In re Axona Int'l Credit & Commerce Ltd., 88 B.R. 597, 606 (Bankr.S.D.N.Y.1988), aff'd, 115 B.R. 442 (S.D.N.Y.1990), appeal dismissed, 924 F.2d 31 (2d Cir.1991); In re Culmer, 25 B.R. at 624; see also S.Rep. No. 989, 95th Cong., 2d Sess. 35 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5821 (§ 304(c) "guidelines are designed to give the court the maximum flexibility in handling ancillary cases").
 
 
 31
 We nonetheless disagree with the bankruptcy court's ruling in this case that a turnover was properly ordered upon the de minimis showing that the disputed funds in the Account were "included in the property involved in Mebco's liquidation proceedings, ... [and] located in this district." 130 B.R. at 712. The court rejected the notion that it was required to make a threshold finding as to the ownership of the funds prior to issuance of the turnover order. In our view, this was not a proper reading of § 304(b)(2).
 
 
 32
 The applicable distinction is drawn in Lawrence P. King, 2 Collier on Bankruptcy p 304.01, at 304-3 (15th ed. 1992) (emphasis added): "For purposes of section 304, the estate of a foreign debtor is defined by the law of the jurisdiction in which the foreign proceeding is pending, with other applicable law serving to define the estate's interest in particular property." See also In re Lines, 81 B.R. 267, 271 (Bankr.S.D.N.Y.1988) (same).
 
 
 33
 This interpretation of § 304(b)(2) is supported by the language of the statute. While § 304(b)(1) empowers a bankruptcy court to enjoin litigation "with respect to property involved in" a foreign insolvency proceeding, presumably "to prevent dismemberment by local creditors of assets located here," S.Rep. No. 989 at 35, § 304(b)(2) authorizes turnover only of "property of such estate, or proceeds of such property." Thus, the use of the term "property of such estate" presupposes an antecedent determination of property interests as a condition to the turnover of property to a foreign representative.
 
 
 34
 This analysis finds further support in the analogy provided by the related provisions of federal bankruptcy law applicable to domestic cases. In a domestic bankruptcy, the commencement of a case creates a bankruptcy estate. 11 U.S.C. § 541(a) (1988). The estate is defined to comprise "all legal or equitable interests of the debtor in property as of the commencement of the case" (with exceptions not pertinent here), which definition is supplemented by a listing of several more specifically described categories of property interests. Id. § 541(a)(1)-(7). Nonetheless, "[a]lthough federal bankruptcy law determines the outer boundary of what may constitute property of the estate, state law determines the 'nature of a debtor's interest' in a given item." In re Crysen/Montenay Energy Co. (Crysen/Montenay Energy Co. v. Esselen Assocs., Inc.), 902 F.2d 1098, 1101 (2d Cir.1990) (quoting In re Howard's Appliance Corp. (Sanyo Elec., Inc. v. Howard's Appliance Corp.), 874 F.2d 88, 93 (2d Cir.1989)).
 
 
 35
 We see no reason why a similar allocation as to controlling law should not apply in § 304 cases. Property interests have an independent legal source, antecedent to the distributive rules of bankruptcy administration, that determines in the first instance the interests of claimant parties in particular property. It logically follows that before a particular property may be turned over pursuant to § 304(b)(2), a bankruptcy court should apply local law to determine whether the debtor has a valid ownership interest in that property when the issue is properly posed by an adverse claimant.
 
 
 36
 Koreag advances two objections to such application of local law by a bankruptcy court. Its first argument, that § 304 permits the turnover of any property "involved in" a foreign bankruptcy, is simply at odds with the relevant statutory language. Although Congress provided in § 304(b)(1) for certain injunctions to be issued regarding property "involved in" a foreign insolvency proceeding, § 304(b)(2) authorizes turnover only of "property of [the] estate" in a foreign proceeding. Thus, Congress used different language in § 304(b)(1) and (2), the two provisions perform different functions, and we are not at liberty to ignore this legislative choice.
 
 
 37
 Koreag next contends that if local law is to be applied, the foreign forum presiding over the insolvency estate, and not a local bankruptcy court, should apply that law. Koreag presses the point that adjudication of creditors' claims in a U.S. court will deprive other creditors of an opportunity to be heard, and defeat the policy of distribution by a single forum which § 304 is designed to ensure. In this connection, Koreag cites In re Lines, 81 B.R. at 272, for the proposition that Refco's claims should be adjudicated in the Swiss proceeding. We find these arguments unavailing.
 
 
 38
 Koreag, as liquidator, has asked a United States bankruptcy court to require the turnover of disputed assets to a foreign insolvency proceeding. The power of the court extends to "property of [the] estate." § 304(b)(2). Once a plausible challenge is presented as to whether particular property falls within the statutory definition, the bankruptcy court whose authority is invoked must determine the legitimacy of that invocation. The nature of this determination demands that it be made prior to the turnover of the property. It is unsatisfactory to say that the property should first be turned over, because it is the ascertainment that property is "of [the] estate" under local law that defines the extent of the court's power to issue the turnover order.
 
 
 39
 It is also not the case that Mebco's other creditors are prejudiced by such a threshold determination as to property ownership. Refco is not merely asserting rights as an ordinary creditor or claimant in a bankruptcy proceeding. Its position is that Mebco does not own the Disputed Funds. A determination that the funds are not property of the estate therefore does not improperly affect other creditors of the estate, because they have valid claims only against the estate's bona fide assets. The situation is clearly distinguishable from an effort by a normal bankruptcy creditor, without any plausible ownership claim to a specific asset, to gain a preferred position vis-a-vis other creditors by initiating a separate legal proceeding. Cf. Victrix, 825 F.2d at 714 (refusal to countenance attachment designed to evade writ of Swedish bankruptcy court); Cunard, 773 F.2d at 456 (same).
 
 
 40
 Finally, In re Lines does not support Koreag's position. That case involved an injunction under § 304(b)(1), utilizing the broader "involved in" standard of that provision. See 81 B.R. at 272. Nevertheless, the court did engage in a threshold determination of local law, holding that the particular property at issue, an insurance fund, was sufficiently connected to the debtor under New York law to be "involved in" the foreign insolvency proceeding. See id. at 271. We similarly conclude that particular property must be determined to be "of [the] estate" before it may be turned over pursuant to § 304(b)(2).
 
 
 41
 B. Choice of Law.
 
 
 42
 Having held that local law determines whether particular property is part of a debtor's estate, we must decide what local law will supply the substantive rule. Refco argues that New York is the jurisdiction whose law is controlling, while Koreag counters that Switzerland should provide the rule of decision.
 
 
 43
 Preliminarily, we are faced with an apparent problem of what choice-of-law rule to apply. Federal courts sitting in diversity jurisdiction are required by Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), to apply the choice-of-law doctrines of the forum state. Many bankruptcy courts have read Klaxon as imposing the forum state's choice-of-law rules on bankruptcy adjudications where the underlying rights and obligations are defined by state law. See, e.g., In re Chanel Fin., Inc. (Continental Cas. Co. v. Kellogg), 102 B.R. 549, 550 (Bankr.N.D.Tex.1988); In re O.P.M. Leasing Servs., Inc. (Hassett v. Far West Fed. Sav. & Loan Ass'n), 40 B.R. 380, 391-92 (Bankr.S.D.N.Y.), aff'd, 44 B.R. 1023 (S.D.N.Y.1984); In re Shepard (Central Trust Co. v. Shepard), 29 B.R. 928, 931 (Bankr.M.D.Fla.1983). In contrast, federal principles should guide our consideration of which jurisdiction's substantive law applies in cases arising out of federal law. See Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir.1980), cert. denied, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981). This is especially appropriate when a case involves controversies implicating important federal bankruptcy policy. Cf. Fore Improvement Corp. v. Selig, 278 F.2d 143, 147 (2d Cir.1960) (Friendly, J., concurring) (absent "overriding bankruptcy policy," state law applies to state-created claims under former Bankruptcy Act).
 
 
 44
 Selecting the appropriate conflicts rules would thus seem to require us to characterize the present issue under § 304(b)(2) as either predominantly founded upon state-created rights, or involving important concerns implicating national bankruptcy policy. For purposes of this appeal, however, we need not untangle the interwoven features of state and federal law, for we discern no significant difference between the applicable federal and New York choice-of-law rules.
 
 
 45
 The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation. See Wells Fargo Asia Ltd. v. Citibank, N.A., 936 F.2d 723, 726-27 (2d Cir.1991), petition for cert. filed, 60 U.S.L.W. 3360 (U.S. Oct. 24, 1991) (No. 91-689); Corporacion Venezolana de Fomento, 629 F.2d at 795. The goal of this analysis is to evaluate the various contacts each jurisdiction has with the controversy, and determine which jurisdiction's laws and policies are implicated to the greatest extent.
 
 
 46
 New York law provides " 'that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." ' " Wells Fargo Asia Ltd., 936 F.2d at 726 (quoting Wells Fargo Asia Ltd. v. Citibank, N.A., 695 F.Supp. 1450, 1453 (S.D.N.Y.1988) (quoting Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 382, 248 N.E.2d 576, 582, 300 N.Y.S.2d 817, 825 (1969))). The federal and New York doctrines " 'invoke[ ] similar considerations.' " Wells Fargo Asia Ltd., 936 F.2d at 726 (quoting Wells Fargo Asia Ltd., 695 F.Supp. at 1453 (citing Corporacion Venezolana de Fomento, 629 F.2d at 795)).
 
 
 47
 Accordingly, we apply an interest analysis consistent with the law of either jurisdiction. Both New York and Switzerland have an interest in the litigation before this court. On the one hand, Refco is incorporated under the laws of New York, with its principal place of business in New York City. Refco performed its obligations under the contract, including confirming the individual transactions, from its New York offices. The Disputed Funds and the Account are located in New York. Moreover, New York as a world financial center has a special concern with transactions such as occurred here and spawned this litigation. See Wells Fargo Asia Ltd., 936 F.2d at 726-27. On the other hand, Switzerland has a valid interest in the administration of Mebco's bankruptcy estate. The Swiss liquidator is concerned with marshalling Mebco's assets and looking after the interests of Mebco's many creditors. Undeniably, Swiss concerns will be affected by the outcome of the current dispute.
 
 
 48
 Despite connections to both jurisdictions, we conclude that New York has a superior interest in the particular question at issue here. New York's concerns relate to the underlying property claims at stake, the corresponding contract rights of the parties, and the conduct giving rise to this particular property dispute. These relationships are ordinarily regulated under New York law, and New York is concerned with how this law operates as to a New York corporation with its principal place of business in New York. Switzerland's interests, on the other hand, focus less upon the ownership of particular property than upon the fair and organized administration of the debtor's estate, once defined.
 
 
 49
 The legal policy of fair and efficient distribution of a debtor's estate is distinct from the policy of how various property rights are determined. In the same way that the question is bifurcated under United States bankruptcy law--with state law defining property interests and federal law providing the scheme of distribution--the interests of the competing jurisdictions should be bifurcated in choice-of-law analysis. Switzerland's primary interest is in the administration of Mebco's insolvency estate. New York's primary interest is in defining and protecting the property interests of its citizens and those who do business there. Thus, New York law is more closely related to the particular property dispute at issue. We conclude that New York law should apply.[6]
 
 
 50
 C. New York Law.
 
 
 51
 Our rulings that (1) a threshold determination as to ownership of the Disputed Funds should have been made, (2) applying New York law, require us to vacate the affirming order of the district court. We now apply New York law to address Refco's claims that it has a superior ownership interest in the particular property subject to this litigation. To the extent that these claims depend upon the resolution of legal issues, we will consider those issues at this juncture to facilitate their definitive resolution upon remand. See United States v. Borello, 766 F.2d 46, 60 n. 23 (2d Cir.1985). Conversely, insofar as determinations of fact must be made in order to adjudicate the claims of the parties, we shall remand to the district court for proceedings not inconsistent with this opinion.
 
 
 52
 As indicated earlier, Refco has advanced contentions premised upon (1) the New York law of constructive trusts, and (2) the New York Uniform Commercial Code. We turn initially to the constructive trust issue, for that question is at least potentially dispositive as to the ownership of all the Disputed Funds.1. Constructive Trust.
 
 
 53
 Refco argues that the Disputed Funds are not property of Mebco's estate because Mebco obtained them by fraud, and the funds should therefore be impressed with a constructive trust in Refco's favor. Specifically, Refco contends that fraud was committed (1) by Mebco's concealment of its deteriorating financial condition following previous representations of financial health which induced Refco to transfer currency to the Account and to Mebco's overseas bank accounts; and (2) by Mebco and Koreag, as liquidator, in that they took Refco's money post-liquidation knowing that Mebco was insolvent and incapable of performing its end of the bargained-for exchange, and without notifying Refco of the liquidation. Refco further alleges that such conduct contravenes equity and good conscience, and results in substantial unjust enrichment of Mebco's insolvency estate. Refco maintains that a constructive trust is "necessary to satisfy the demands of justice." Latham v. Father Divine, 299 N.Y. 22, 27, 85 N.E.2d 168, 170 (1949).
 
 
 54
 As we noted in In re Howard's Appliance Corp.:
 
 
 55
 [T]he Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition," [United States v.] Whiting Pools, [Inc., 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2314 n. 10, 76 L.Ed.2d 515 (1983) ]; see S.Rep. No. 989, 95th Cong., 2d Sess. 82 and H.R.Rep. No. 595, 95th Cong., 2d Sess. 368, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5868, 6323-24; see also In re Kennedy & Cohen, Inc., 612 F.2d 963, 965 (5th Cir.) (under previous bankruptcy statute, property held by debtor in constructive trust "belongs to the beneficiary and never becomes a part of the bankruptcy estate"), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). A constructive trust, therefore, "confers on the true owner of the property an equitable interest in the property superior to the trustee's," [In re] Quality Holstein Leasing, 752 F.2d [1009, 1012 (5th Cir.1985) ]; cf. In re General Coffee Corp., 828 F.2d 699, 706 (11th Cir.1987) (constructive trust beneficiary has priority to trust assets over a judicial lienholder or execution creditor), cert. denied, U.S. [1007], 108 S.Ct. 1470, 99 L.Ed.2d 699 (1988).
 
 
 56
 874 F.2d at 93 (footnote omitted).
 
 
 57
 The foregoing authorities deal with domestic bankruptcies, where the bankruptcy estate is defined to include, inter alia, "all legal or equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C. § 541(a)(1), but to exclude "any power that the debtor may exercise solely for the benefit of an entity other than the debtor." Id. § 541(b)(1). We believe, however, that they should also govern determinations regarding "the property of [a bankruptcy] estate" under § 304(b)(2), and accordingly that Refco should be given the opportunity to present its constructive trust theory in a trial setting. The courts below never reached this issue, so we hear this appeal without an adequate factual record for its resolution. Accordingly, after setting forth the applicable principles of New York law, we will leave the definitive resolution of this issue for determination upon remand.
 
 
 58
 Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. See Bankers Sec. Life Ins. Soc'y v. Shakerdge, 49 N.Y.2d 939, 940, 406 N.E.2d 440, 440, 428 N.Y.S.2d 623, 624 (1980); Simonds v. Simonds, 45 N.Y.2d 233, 241-42, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 363 (1978); Sharp v. Kosmalski, 40 N.Y.2d 119, 121, 351 N.E.2d 721, 723, 386 N.Y.S.2d 72, 75 (1976). Although these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be "rigidly limited." Simonds, 45 N.Y.2d at 241, 380 N.E.2d at 194, 408 N.Y.S.2d at 363; see also Bankers Sec. Life Ins. Soc'y, 49 N.Y.2d at 940, 406 N.E.2d at 440, 428 N.Y.S.2d at 624 (application of doctrine to particular circumstances "susceptible of some flexibility").
 
 
 59
 " ' "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." ' " Brand v. Brand, 811 F.2d 74, 77 (2d Cir.1987) (quoting Simonds, 45 N.Y.2d at 241, 380 N.E.2d at 193, 408 N.Y.S.2d at 363 (quoting Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.))). The doctrine's " 'applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them.' " Simonds, 45 N.Y.2d at 241, 380 N.E.2d at 194, 408 N.Y.S.2d at 363 (quoting Latham, 299 N.Y. at 27, 85 N.E.2d at 170).
 
 
 60
 Koreag contends that a constructive trust may not be imposed here because there is no confidential or fiduciary relation between the parties. We agree that no such relationship existed between Refco and Mebco. By virtue of their exchange agreements, Refco and Mebco stood in an ordinary, arms-length commercial relationship. Purely commercial transactions do not give rise to a fiduciary relationship. See Rodgers v. Roulette Records, Inc., 677 F.Supp. 731, 738-39 (S.D.N.Y.1988); Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 33 A.D.2d 766, 766, 306 N.Y.S.2d 599, 600 (1st Dep't 1969), aff'd, 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, cert. denied, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).
 
 
 61
 Moreover, "[i]t is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists." In re Black & Geddes, Inc. (Dampskibsselskabet AF 1912 Aktieselskab v. Black & Geddes, Inc.), 35 B.R. 830, 836 (Bankr.S.D.N.Y.1984) (collecting cases). Here, Mebco contracted with Refco to buy and sell currencies, and was under no special duty to segregate the funds from its general account.
 
 
 62
 We do not believe, however, that the lack of a fiduciary relationship between Mebco and Refco automatically defeats Refco's claim of constructive trust. Although a fiduciary relationship is one of the factors cited by New York courts, the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity. See Simonds, 45 N.Y.2d at 241, 380 N.E.2d at 194, 408 N.Y.S.2d at 363; Latham, 299 N.Y. at 27, 85 N.E.2d at 170. New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment in a wide range of circumstances. See Palazzo v. Palazzo, 121 A.D.2d 261, 264, 503 N.Y.S.2d 381, 383-84 (1st Dep't 1986) ("the power of equity to employ a constructive trust to reach a just result is not strictly limited by the conditions set forth in Sharp v. Kosmalski "); Tordai v. Tordai, 109 A.D.2d 996, 997, 486 N.Y.S.2d 802, 804 (3d Dep't 1985) (Sharp v. Kosmalski factors "are not rigid, but flexible considerations for the court to apply in determining whether a constructive trust should be imposed"); Coco v. Coco, 107 A.D.2d 21, 24, 485 N.Y.S.2d 286, 289 (2d Dep't 1985) (" 'these factors are merely useful guides and are not talismanic' ") (quoting Reiner v. Reiner, 100 A.D.2d 872, 874, 474 N.Y.S.2d 538, 541 (2d Dep't 1984)).
 
 
 63
 Hence, New York courts have at times dispensed with one or more of these requirements. In Palazzo, 121 A.D.2d at 264, 503 N.Y.S.2d at 383-84, for example, the court stated that the arguable lack of a transfer would not prevent the imposition of a constructive trust when the other conditions were met and equitable considerations warranted this resolution. See also Tordai, 109 A.D.2d at 997, 486 N.Y.S.2d at 804 (promise implied from existence of confidential relation).
 
 
 64
 More relevant to the issue at hand, the New York Court of Appeals has expressly stated that a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship. See Simonds, 45 N.Y.2d at 242, 380 N.E.2d at 194, 408 N.Y.S.2d at 363 (citing Latham, 299 N.Y. at 27, 85 N.E.2d at 170); see also Cavallaro v. Lewis, 198 Misc. 412, 413, 98 N.Y.S.2d 730, 731 (Sup.Ct.1950). Further, the key factor is unjust enrichment, not willfully wrongful conduct. As the Court of Appeals stated in Simonds:
 
 
 65
 It is agreed that the purpose of the constructive trust is prevention of unjust enrichment (Sharp v. Kosmalski, 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 76, 351 N.E.2d 721, 724, supra; Restatement, Restitution, § 160; 5 Scott, Trusts [3d ed.], § 462.2).
 
 
 66
 Unjust enrichment, however, does not require the performance of any wrongful act by the one enriched (Lengel v. Lengel, 86 Misc.2d 460, 465-66, 382 N.Y.S.2d 678, 681-682, supra; Richards v. Richards, 58 Wis.2d 290, 293-294, 206 N.W.2d 134, supra; see, generally, 5 Scott, Trusts [3d ed.], § 462.2). Innocent parties may frequently be unjustly enriched. What is required, generally, is that a party hold property "under such circumstances that in equity and good conscience he ought not to retain it" (Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337, 339; see Sharp v. Kosmalski, 40 N.Y.2d 119, 123, 386 N.Y.S.2d 72, 76, 351 [N.E.]2d 721, 724, supra; Sinclair v. Purdy, 235 N.Y. 245, 253-254, 139 N.E. 255, 258-259).
 
 
 67
 45 N.Y.2d at 242, 380 N.E.2d at 194, 408 N.Y.S.2d at 364.
 
 
 68
 Federal courts applying this doctrine have not been insensitive to the need for flexibility, and thus on occasion have not required a fiduciary relationship in order to impose a constructive trust. See, e.g., E.W. Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n, 743 F.Supp. 176, 179-80 (S.D.N.Y.1990) (constructive trust imposed, applying New York law, despite absence of fiduciary relationship); SEC v. Levine, 689 F.Supp. 317, 321-23 (S.D.N.Y.1988) (same), modified on other grounds, 881 F.2d 1165 (2d Cir.1989); see also Republic of Philippines v. Marcos, 806 F.2d 344, 355 (2d Cir.1986) ("constructive trust is simply a remedy to prevent unjust enrichment and may or may not involve a fiduciary relationship") (citing Restatement of Restitution § 160 comment a (1937)), cert. denied, 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784, 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987).
 
 
 69
 We note, further, that the Disputed Funds were transferred after Mebco had been declared insolvent and Koreag had assumed its office as liquidator of the insolvency estate under Swiss law. Such an entity is generally deemed to occupy a fiduciary status vis-a-vis creditors of the insolvency estate. See, e.g., Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985) (bankruptcy trustee has fiduciary duty to both creditors and shareholders); Stein v. United Artists Corp., 691 F.2d 885, 892-93 (9th Cir.1982) (debtor in possession holds title to property as fiduciary for creditors); In re Nat'l Molding Co., 230 F.2d 69, 71 (3d Cir.1956) (bankruptcy trustee, " 'as the title of his office imports, ... is trustee for all who have interests, and according to those interests ' ") (quoting In re Ducker, 134 F. 43, 47 (6th Cir.1905) (emphasis in Nat'l Molding )); Ragsdale v. New England Land & Dev. Co., 250 Ga. 233, 234-35, 297 S.E.2d 31, 32-33 (1982) (trustee in bankruptcy acts for benefit and protection of creditors).
 
 
 70
 Clearly, Koreag was acting in some fiduciary capacity toward some entities at the time it received the Disputed Funds from Refco. Whether or not this status resulted in a fiduciary relationship between Refco and Koreag for purposes of the transactions at issue and New York constructive trust doctrine, furthermore, it remains relevant to our overall assessment of the issue whether unjust enrichment has occurred for which a constructive trust should be imposed. In any event, to the extent that Koreag might be deemed not to have been acting as a fiduciary for Refco, we have seen that such a relationship is not invariably required for the imposition of a constructive trust under New York law.
 
 
 71
 As to the other requirements for a constructive trust, a promise of reciprocal exchange clearly arises from the stipulations that, as to both types of currency exchanges at issue, "Refco and Mebco were each, at once, a purchaser and seller of currencies," and "[t]he agreements between Refco and Mebco contemplated simultaneous exchanges of currencies." Further, the transfer of the Disputed Funds by Refco was manifestly made in reliance upon that promise, and the receipt of the Disputed Funds by Koreag without ultimate performance of the promised exchanges unjustly enriched Mebco's insolvency estate.
 
 
 72
 Thus, if we were to decide the issue on the present record, we would impose a constructive trust upon the Disputed Funds in behalf of Refco. The issue has not been addressed in a trial setting, however, and the definitive resolution of this essentially equitable issue should be made only after the parties have had a full opportunity to present all pertinent considerations to a finder of fact. Among other things, for example, it is at least puzzling that some currency exchanges were bilaterally performed between Refco and Mebco after Mebco went into liquidation, although those involving the Disputed Funds were not. See supra note 2. In any event, the question should be resolved upon a complete record.
 
 
 73
 We will therefore remand for further proceedings on this issue, not inconsistent herewith, in which Koreag will bear the practical burden, at least, of establishing why a constructive trust should not be imposed upon the Disputed Funds.
 
 
 74
 2. New York Uniform Commercial Code.
 
 
 75
 In the event that Refco does not prevail on the constructive trust issue, Refco's contentions regarding the New York Uniform Commercial Code (the "Code") must then be considered. Article 2 of the Code "applies to transactions in goods." N.Y.U.C.C. § 2-102 (McKinney 1964). As a threshold matter, therefore, it must be determined whether the foreign currencies that Refco and Mebco agreed to exchange were "goods" within the meaning of section 2-102.
 
 
 76
 As pertinent here, N.Y.U.C.C. § 2-105 (McKinney 1964) defines "[g]oods" as "all things ... which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid " (emphasis added). This definition indicates that money is excluded only when it is used as the medium of exchange. In a currency exchange contract, however, the money is not the medium of exchange, but rather the object of exchange. Such currency thus constitutes "goods" within the meaning of section 2-102, and accordingly a contract to exchange currencies is subject to the Code. This view has recently been approved by the New York Court of Appeals, which applied the Code to a contract to exchange U.S. dollars for Italian lire. See Intershoe, Inc. v. Bankers Trust Co., 77 N.Y.2d 517, 521, 571 N.E.2d 641, 643, 569 N.Y.S.2d 333, 336 (1991) ("There seems no question that the UCC applies to foreign currency transactions (see, UCC 2-105 Official Comment 1, McKinney's Cons.Laws of N.Y., Book 62 1/2, UCC 2-105, at 96; Buerger & O'Connor, Practice Commentary, op. cit., at 94).").
 
 
 77
 Since currency exchanges involve the simultaneous trading of money qua goods, a participant in such an exchange is both a seller with respect to the currency it is delivering, and a buyer with respect to the currency it is receiving. N.Y.U.C.C. § 2-304(1) (McKinney 1964) provides that payment under a contract can be made "in money or otherwise," and that if the price "is payable in whole or in part in goods each party is a seller of the goods which he is to transfer." Therefore, in any exchange of currencies, the parties are both sellers of the currencies that they transfer. It follows that they are both buyers of the currencies that they receive.
 
 
 78
 Thus, Refco was at once a seller of the approximately 6.9 million dollars of the Disputed Funds that it transferred to the Account, and a buyer of the foreign currencies that the parties intended Refco to receive in exchange (the "6.9 Million Dollar Transaction"). In addition, Refco was a seller of the foreign currencies that it delivered to Mebco's European accounts from April 28 to May 2, 1989, and a buyer of the approximately 4.1 million U.S. dollars in the Account and apparently designated to pay for the transferred foreign currencies (the "4.1 Million Dollar Transaction"). The remedies available to Refco will correspond to, and vary in accordance with, Refco's respective positions as buyer and seller in the two transactions, which we address in turn.
 
 The 6.9 Million Dollar Transaction
 
 79
 As a seller of U.S. dollars in this transaction, Refco is entitled to reclaim those dollars, whether the contract to exchange currencies is considered a sale on credit or for cash. If the transaction is deemed a credit sale, "[w]here the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after [their] receipt." N.Y.U.C.C. § 2-702(2) (McKinney 1964). It is clear that Mebco was in fact insolvent at the time it received the U.S. dollars in question, and as will appear, Refco made appropriate demand within ten days thereafter.
 
 
 80
 If the currency exchange is considered a cash sale, Refco has a similar right of reclamation. N.Y.U.C.C. § 2-310(a) (McKinney 1964) provides that unless the parties agree otherwise, payment for goods is due on delivery. Section 2-507(2) further specifies that "[w]here payment is due and demanded on the delivery to buyer of goods ..., his right as against the seller to retain or dispose of them is conditional upon his making the payment due." These provisions operate to create a seller's right to reclaim goods from an insolvent buyer who takes possession of the goods, but fails to tender payment. See Szabo v. Vinton Motors, Inc., 630 F.2d 1, 3 (1st Cir.1980); In re Samuels & Co. (Stowers v. Mahon), 526 F.2d 1238, 1244-45 (5th Cir.) (in banc), cert. denied, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); In re Wathen's Elevators, Inc. (Harris Trust & Sav. Bank v. Wathen's Elevators, Inc.), 32 B.R. 912, 917-18 (Bankr.W.D.Ky.1983); see also In re Coast Trading Co. (Collingwood Grain, Inc. v. Coast Trading Co.), 744 F.2d 686, 689-90 (9th Cir.1984) (§ 2-702(2) applies to ostensible cash sales); N.Y.U.C.C. § 2-507 (McKinney 1964) official comment 3 (ten day notice requirement for reclamation under § 2-702(2) applies to § 2-507(2)).
 
 
 81
 Applying these principles, we find that Refco has a right of reclamation against Mebco with respect to the 6.9 Million Dollar Transaction. Refco's interest in the approximately 6.9 million dollars of Disputed Funds related to this transaction is therefore superior to Mebco's. Under these circumstances, these funds cannot be considered "property of [Mebco's] estate" within the meaning of 11 U.S.C. § 304(b)(2) (1988), and thus cannot be the subject of a turnover order thereunder.[7]
 
 
 82
 Koreag concedes that Refco made an adequate section 2-207(2) demand for the return of those funds, but contends that Refco's state law right of reclamation is limited by 11 U.S.C. § 546(c) (1988), which provides in pertinent part:
 
 
 83
 (c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but--
 
 
 84
 (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor....
 
 
 85
 Id. (emphasis added).
 
 
 86
 Koreag contends that § 546(c) provides the exclusive remedy for a seller who seeks to reclaim goods from a debtor in bankruptcy, see In re Rawson Food Serv., Inc. (Flav-O-Rich, Inc. v. Rawson Food Serv. Inc.), 846 F.2d 1343, 1346 (11th Cir.1988); In re Rozel Indus., Inc. (Hitachi Denshi Am., Ltd. v. Rozel Indus., Inc.), 74 B.R. 643, 645 (Bankr.N.D.Ill.1987) (collecting cases), and that Refco made only an oral demand upon Mebco (i.e., the Weiss-Savio conversation on May 3, 1989) for return of the approximately 6.9 million dollars during the ten-day period stipulated by section 546(c)(1). Mebco discounts the written demand made by Citibank upon Swiss Bank-NY the same day because, Mebco contends, the relationship between Mebco (as a depositor) and Swiss Bank was that of debtor and creditor, not principal and agent. The Weiss affidavit filed in the attachment proceedings is similarly disparaged because it "did not mention Refco's alleged right to reclamation under the UCC in words or substance."
 
 
 87
 We see no merit in Koreag's position. We note that Swiss Bank-NY appears clearly to have performed agency functions for Mebco with respect to the transactions at issue herein that went well beyond the "bare bones" relationship between a bank and a depositor. See Delbrueck & Co. v. Manufacturers Hanover Trust Co., 609 F.2d 1047, 1051-52 (2d Cir.1979); Ehag Eisenbahnwerte Holding Aktiengesellschaft v. Banca Nationala a Romaniei, 306 N.Y. 242, 250-51, 117 N.E.2d 346, 350 (1954). In any event, § 546(c) is addressed to "the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title," and has no bearing here.
 
 
 88
 We note in this connection that a § 304 proceeding is not a bankruptcy case that implicates the full range of procedural and substantive provisions applicable to domestic bankruptcies. See In re Axona Int'l Credit & Commerce Ltd., 88 B.R. at 606 (§ 304 case does not give rise to full-scale bankruptcy with automatic stay or avoidance powers); In re A. Tarricone, Inc., 80 B.R. 21, 23 (Bankr.S.D.N.Y.1987) (§ 304 does not grant avoidance powers); In re Metzeler, 78 B.R. at 677 (same); In re Gee (Universal Casualty & Sur. Co. v. Gee), 53 B.R. 891, 896 (Bankr.S.D.N.Y.1985) (§ 304 case a limited one designed to function in aid of foreign proceeding); 2 Collier on Bankruptcy p 304.01, at 304-3 (same). Thus, the limited function of § 304 reinforces the clear language of § 546(c). Section 546(c) does not apply in a § 304 proceeding, and Koreag's arguments premised upon § 546(c) are accordingly unavailing.
 
 The 4.1 Million Dollar Transaction
 
 89
 Refco's Code remedies with respect to this transaction are remarkably different. Here, Refco transferred foreign currencies to Mebco European accounts in anticipation of receiving corresponding U.S. dollars from the Account. Thus, Refco stands in the position of buyer with respect to those dollars. Accordingly, Refco has available to it only the Code remedies of a buyer, which do not include a right equivalent to that of reclamation in this case.
 
 
 90
 These remedies are set forth in N.Y.U.C.C. § 2-711 (McKinney 1964), which provides in pertinent part:
 
 
 91
 (1) Where the seller fails to make delivery or repudiates ... then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
 
 
 92
 (a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
 
 
 93
 (b) recover damages for non-delivery as provided in this Article (Section 2-713).
 
 
 94
 (2) Where the seller fails to deliver or repudiates the buyer may also
 
 
 95
 (a) if the goods have been identified recover them as provided in this Article (Section 2-502); or(b) in a proper case obtain specific performance or replevy the goods as provided in this Article (Section 2-716).
 
 
 96
 The official comment to this section specifies that its purpose is "[t]o index ... the buyer's remedies, subsection (1) covering those remedies permitting the recovery of money damages, and subsection (2) covering those which permit reaching the goods themselves." Id. § 2-711 official comment 1. Thus, only the subsection (2) remedies could arguably provide any basis for ownership rights in specific property.
 
 
 97
 Subsection (2)(a) authorizes recovery of "identified" goods, pursuant to section 2-502. In turn, section 2-502(1) authorizes recovery of specific goods from an insolvent buyer where the goods have been identified to the pertinent contract pursuant to section 2-501. No such identification has occurred, however, in this case. Mebco was not required to provide especially identified or segregated currency, but rather any nonspecific U.S. dollars in the specified quantity.
 
 
 98
 Subsection (2)(b) authorizes specific performance or replevin as provided in section 2-716. Section 2-716(1) allows specific performance "where the goods are unique or in other proper circumstances." The U.S. dollars at issue here are obviously not "unique." The pertinent official comment states that "inability to cover is strong evidence of 'other proper circumstances.' " N.Y.U.C.C. § 2-716 (McKinney 1964) official comment 2. Similarly, section 2-716(3) authorizes replevin "for goods identified to the contract if after reasonable effort [the buyer] is unable to effect cover for such goods." Clearly, Refco can "cover" Mebco's failure to perform its side of the 4.1 Million Dollar Transaction by obtaining other U.S. dollars.
 
 
 99
 We conclude that the Code poses no impediment to deeming the portion of the Disputed Funds that is involved in the 4.1 Million Dollar Transaction to be "property" of Mebco's estate within the meaning of § 304(b)(2). We therefore turn to Refco's alternative contention that under a proper analysis of § 304(c), turnover is inappropriate.
 
 
 100
 D. Turnover under Section 304(c).
 
 
 101
 Section 304(c) specifies six factors that are to be considered in fashioning a remedy in an ancillary case, including turnover of property. Four of those factors are relevant to this case:
 
 
 102
 (1) just treatment of all holders of claims against or interest in such estate;
 
 
 103
 (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
 
 
 104
 ....
 
 
 105
 (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]
 
 
 106
 (5) comity....
 
 
 107
 11 U.S.C. § 304(c) (1988).
 
 
 108
 Further, as noted earlier, the overriding purpose of § 304 is to prevent piecemeal distribution of a debtor's estate, and a bankruptcy court is accorded broad latitude in fashioning an appropriate remedy in a § 304 proceeding.
 
 
 109
 Refco argues that under the relevant § 304(c) factors, turnover of the property was improper because the bankruptcy court improperly emphasized the factor of "comity" to the exclusion of other vital considerations. Although neither the Code nor the legislative history accords superior weight to the comity factor, the bankruptcy court deemed itself bound by prior Southern District of New York decisions holding that comity is of paramount concern. See Koreag, 130 B.R. at 712 (citing In re Culmer, 25 B.R. at 628; In re Gee, 53 B.R. at 891). But see In re Papeleras Reunidas, S.A., 92 B.R. 584, 594 (Bankr.E.D.N.Y.1988) (comity given only equal weight with other factors; Southern District view explicitly rejected).
 
 
 110
 We see no need to reconcile these disparate views in the present posture of this case. If Refco prevails on the constructive trust issue upon remand, none of the Disputed Funds will be subject to turnover. If Koreag prevails on that issue, only the portion of the Disputed Funds involved in the 4.1 Million Dollar Transaction will be subject to turnover. Under any view of the relative weight to be accorded the pertinent § 304(c) factors, turnover would be a permissible exercise of discretion as to those funds.
 
 
 111
 In the only possible turnover scenario, the funds subjected to turnover would be subject only to Refco's claim as a general, unsecured creditor. Refco could assert no valid security interest or other benefit of domestic law whose deprivation might render a turnover unfair or otherwise improper. Cf. Interpool, Ltd. v. Certain Freights of the M/V Venture Star, 102 B.R. 373, 378-80 (D.N.J.1988) (denying § 304 petition because American creditor denied procedural protections and remedy of equitable subordination under Australian law), appeal dismissed, 878 F.2d 111 (3d Cir.1989); In re Toga Mfg. Ltd., 28 B.R. 165, 168-71 (Bankr.E.D.Mich.1983) (denying § 304 petition because domestic creditor would lose priority status in Canadian proceeding).
 
 
 112
 As the bankruptcy court stated, "Refco does not dispute that Switzerland's insolvency procedures are fundamentally fair." Koreag, 130 B.R. at 715. Accordingly, Refco will not be prejudiced if required to litigate unsecured claims in a Swiss proceeding. Comity calls for such a result, and Refco's prior attachment of the Disputed Funds does not suffice to defeat a turnover order under § 304(c). See Cunard, 773 F.2d at 458.
 
 Conclusion
 
 113
 The revised order of the district court is vacated and the matter is remanded for further proceedings not inconsistent with this opinion. The order of this court entered October 1, 1991 that granted a stay pending final determination of this appeal is continued, pending final determination of the § 304 proceeding upon remand. Any future appeal in that proceeding shall be referred to this panel. The mandate shall issue forthwith.
 
 
 
 [1]
 All times herein are Eastern Standard Time
 
 
 [2]
 As will appear, Refco received a small portion of the foreign currencies covered by its April 28 transfer to the Account of $7,407,510. In addition, the parties have stipulated that at 3:46 p.m. on April 27, 1989, after Mebco was placed into liquidation, Refco wired two million dollars to the Account for which it received the agreed foreign currencies in exchange
 
 
 [3]
 The precise amount in dispute is $11,191,334.52 (the "Disputed Funds")
 
 
 [4]
 Section 304 provides:
 (a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.
 (b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may--
 (1) enjoin the commencement or continuation of--
 (A) any action against--
 (i) a debtor with respect to property involved in such foreign proceeding; or
 (ii) such property; or
 (B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property or such estate;
 (2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
 (3) order other appropriate relief.
 (c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with--
 (1) just treatment of all holders of claims against or interests in such estate;
 (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
 (3) prevention of preferential or fraudulent dispositions of property of such estate;
 (4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
 (5) comity; and
 (6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.
 
 
 [5]
 There were concededly funds in the Account, when Koreag initiated the § 304 proceeding, in addition to those claimed by Refco, so we can see no impediment to the bankruptcy court's exercise of jurisdiction over that proceeding under any view of the jurisdictional issue. As will appear, however, we disagree with the bankruptcy court's conclusion that the threshold determination of the ownership of the funds in the Account claimed by Refco is to be made under Swiss law
 
 
 [6]
 Refco argues on appeal that the bankruptcy court lacked an adequate basis for its conclusion that "[u]nder Swiss law, the [Disputed Funds] are included in the property involved in Mebco's liquidation proceedings." 130 B.R. at 712. Our conclusion that Swiss law does not govern this controversy moots the contention
 
 
 [7]
 We note that a seller's right to reclaim under N.Y.U.C.C. § 2-702(2) (McKinney 1964) "is subject to the rights of a buyer in ordinary course or other good faith purchaser under this Article (Section 2-403)," id. § 2-702(3), and that a similar rule applies in the case of a constructive trust. See Simonds, 45 N.Y.2d at 242, 380 N.E.2d at 194, 408 N.Y.S.2d at 364; Majer v. Schmidt, 169 A.D.2d 501, 502, 564 N.Y.S.2d 722, 725 (1st Dep't 1991); Birnbaum v. Birnbaum, 117 A.D.2d 409, 420, 503 N.Y.S.2d 451, 458 (4th Dep't 1986). The existence of a third party with a property interest superior to that of both the initial claimant and the debtor, however, would simply be an added reason to preclude turnover under § 304(b)(2)